EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Felix N. Román Negrón y otros<br><br>Apelados<br><br>v.<br><br>Colegio de Contadores Públicos Autorizados y otros<br><br>Apelantes | Apelación<br><br>2023 TSPR 87<br><br>212 DPR ___ |

Número del Caso:  AC-2022-0026

Fecha:  30 de junio de 2023

Tribunal de Apelaciones:

Panel IX

Abogada de la parte apelante:

Lcda. Veronica Ferraiuoli Hornedo

Abogado de la parte apelada:

Lcdo. Ramón L. Rosario Cortés

Oficina del Procurador General:

Hon. Fernando Figueroa Santiago
Procurador General

Lcdo. Omar Andino Figueroa
Subprocurador General

Lcda. Mabel Sotomayor Hernández
Subprocuradora General

Lcda. Carmen I. Riera Cintrón
Procuradora General Auxiliar

Abogados de los *Amicus Curiae:*

Lcdo. William Vázquez Irizarry
Lcdo. Ángel Cintrón García

Materia: Sentencia con Opiniones de conformidad y Opinión disidente.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Félix N. Román Negrón y otros

     Apelados

       v.                 AC-2022-0026

Colegio de Contadores Públicos Autorizados y otros

     Apelantes

SENTENCIA

En San Juan, Puerto Rico, a 30 de junio de 2023.

Luego de examinar el recurso de apelación de epígrafe, así como los alegatos de las partes, y tras contar con el beneficio de la celebración de una vista oral, las Juezas y los Jueces de esta Curia se encuentran igualmente divididos en cuanto a sus votos. Toda vez que la controversia que se nos convocó resolver es de índole constitucional, el Art. V, Sec. 4 de la Constitución del Estado Libre Asociado Puerto Rico, dispone que ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces o juezas de que esté compuesto este Tribunal. Art. V, Sec. 4, Const. ELA [Const. PR], LPRA, Tomo 1.

En consecuencia, se revoca la *Sentencia* del Tribunal de Apelaciones que declaró inconstitucional los Artículos 2(h), 3, 4 y 9 de la Ley Núm. 75 de 31 de mayo de 1973, mejor conocida como la *Ley para crear el Colegio de Contadores Públicos Autorizados de Puerto Rico*, 20 LPRA secs. 794, 795-796 & 801, que exigen la colegiación compulsoria de los contadores públicos autorizados para que estos puedan ejercer su profesión en Puerto Rico. Véase también: Sánchez Rodríguez v. López Jiménez, 116 DPR 392 (1985); Pueblo v. Pérez Mendez, 83 DPR 539 (1961). En virtud de esto, se desestima la demanda que se instó en el recurso de epígrafe.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emite una Opinión de Conformidad. El Juez Asociado señor Rivera García emite una Opinión de Conformidad. El Juez Asociado señor Colón Pérez está conforme con el resultado al que hoy se llega y hace constar las expresiones siguientes:

"El requisito de colegiación compulsoria, que se exige en nuestro País como condición para ejercer determinadas profesiones, es una medida de protección social. El mismo, a todas luces, puede co-habitar en nuestro ordenamiento jurídico con el derecho constitucional a la libre asociación. **Uno no cancela al otro**. Sobre el particular, véase nuestra Opinión de Conformidad en *Reyes Sorto y otros v. ELA y otros*, 2023 TSPR 62, 211 DPR __ (2023).

Al no existir en este Tribunal los votos que exige el Art. V, Sec. 4, de la Constitución del Estado Libre Asociado de Puerto Rico para sentenciar lo contrario, esta vez en lo relacionado al requisito de colegiación compulsoria de las y los contadores públicos autorizados como condición para ejercer la referida profesión en nuestra jurisdicción, estamos de acuerdo con el resultado al que se llega en el día de hoy. Art. V, Sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 427.".

El Juez Asociado señor Martínez Torres emite una Opinión Disidente a la cual se unen la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Kolthoff Caraballo y el Juez Asociado señor Feliberti Cintrón.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Félix Norman Román Negrón
y otro

     Apelados

       v.                       AC-2022-0026

Colegio de Contadores
Públicos Autorizados y
otros

     Apelantes

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad

En San Juan, Puerto Rico, a 30 de junio de 2023.

Una vez más nos enfrentamos a la controversia constitucional sobre membresía obligatoria a un colegio profesional. En este caso, nos correspondía pautar si la colegiación compulsoria que dispone la Ley Núm. 75-1973, _infra_, respecto a los contadores públicos autorizados, viola de manera impermisible el derecho de libertad de asociación de los demandantes. Luego de un análisis sopesado de los hechos y del escrutinio aplicable, soy del criterio que la colegiación compulsoria en controversia es necesaria para adelantar el interés apremiante del Estado de regular la profesión de la contabilidad pública. En vista de que la Sentencia que emite este Tribunal —producto del

empate en los votos de sus integrantes— conduce a un resultado que valida este mecanismo en el contexto particular de este caso, estoy conforme. Procede la revocación del dictamen del Tribunal de Apelaciones y, consecuentemente, la desestimación de la demanda.

Expongo a continuación los fundamentos en los que se basa mi conformidad con la determinación de esta Curia, no sin antes esbozar detalladamente el trasfondo fáctico que originó esta controversia.

## I.

Los Sres. Félix Norman Román y Virgilio Vega III (demandantes) presentaron una demanda de sentencia declaratoria contra el Colegio de Contadores Públicos Autorizados (Colegio de CPA) y la Junta de Contabilidad solicitando que se decretara la inconstitucionalidad de la colegiación compulsoria de los contadores públicos autorizados (CPA).[1] Ambos alegaron que no querían pertenecer al Colegio y que el requisito de membresía para practicar la profesión lesionaba su derecho constitucional de libertad de asociación. Expresaron que, según lo resuelto en Rodríguez Casillas *et al.* v. Colegio, 202 DPR 428 (2019) y Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791 (2014), el Estado solo podía interferir con el derecho fundamental a la libre asociación si demostraba la existencia de un interés

---

[1] En particular, solicitaron que se declararan inconstitucionales los artículos 2(h), 3, 4 y 9 de la Ley Núm. 75 de 31 de mayo de 1973, según enmendada (20 LPRA sec. 793 et seq.) (Ley Núm. 75-1973).

apremiante y la inexistencia de medidas menos onerosas para proteger ese interés. Entonces, aunque reconocieron que el interés de reglamentar la profesión para la protección del público era importante, afirmaron que existían medidas menos onerosas que la colegiación compulsoria para proteger dicho interés. En ese sentido, aseveraron que la Junta de Contabilidad, creada en virtud de la Ley de Contabilidad Pública de 1945, Ley Núm. 293 del 15 de mayo de 1945, según enmendada (20 LPRA sec. 771-789) (Ley Núm. 293-1945), era la entidad designada para adelantar el interés de reglamentar la profesión de contador público, toda vez que era el ente facultado para regular y fiscalizar a estos profesionales. Por eso, señalaron que el requisito de colegiación resultaba innecesario.

El Colegio de CPA contestó la demanda. Por una parte, admitió que la Junta de Contabilidad solamente expedía o renovaba licencias para ejercer la profesión de contador público autorizado en Puerto Rico a personas que fueran miembros del Colegio de CPA. Asimismo, aceptó que la Ley Núm. 75 de 31 de mayo de 1973, según enmendada (20 LPRA sec. 793 et seq.) (Ley Núm. 75-1973) les exigía a los miembros del Colegio de CPA pagar una cuota anual por concepto de colegiación y que, además, el estatuto estipulaba que cualquier miembro que no pagara su cuota sería suspendido de la profesión por la Junta de Contabilidad. Sin embargo, alegó que la Asamblea Legislativa le impartió al Colegio de CPA un rol activo en la regulación de la profesión con funciones

que incluyen: colaborar con el proceso disciplinario de los miembros; inspeccionar, supervisar y auditar las bitácoras; y certificar el cumplimiento con educación jurídica continua, entre otras. Así, arguyó que la colegiación compulsoria de CPA cumplía con los requisitos legales necesarios para su constitucionalidad.

Específicamente, sostuvo que el esquema regulatorio que creó la Asamblea Legislativa en cuanto a los CPA respondía a un interés apremiante de salvaguardar que la ciudadanía recibiera servicios de contabilidad pública de la más alta competencia y calidad. Asimismo, indicó que no existían medidas menos onerosas para alcanzar ese fin público apremiante. En apoyo de esto último, alegó que la Junta de Contabilidad carecía de los recursos económicos y de personal necesarios para descargar adecuadamente las funciones reglamentarias que realizaba actualmente el Colegio de CPA.

Por su parte, el Estado presentó una *Moción de sentencia sumaria*. Planteó que no existía controversia sobre los hechos del caso y que procedía resolver el asunto sumariamente por tratarse de una cuestión de estricto derecho. En la moción, el Estado destacó que, conforme a lo resuelto por este Tribunal en Rodríguez Casillas *et al.* v. Colegio, supra, y Rivera Schatz v. ELA y C. Abo. PR II, supra, la controversia se debía analizar a la luz de un escrutinio estricto ya que la medida impugnada interfería con el derecho fundamental de libre asociación. En ese

momento, el Estado expresó que "cualquier disposición legal que imponga un requerimiento de colegiación o membresía a cualquier entidad para el ejercicio de una profesión regulada por una junta examinadora en virtud de ley, es inconstitucional al amparo de Rodríguez Casillas, supra". *Moción de sentencia sumaria*, Apéndice de la *Apelación*, pág. 83. Los demandantes coincidieron con la posición del Estado, por lo que prestaron su anuencia a que la controversia se resolviera sumariamente. No obstante, veremos que el Estado reenfocó ese análisis tras confirmar que la Junta de Contabilidad no tiene la capacidad administrativa ni económica para llevar a cabo el proceso de reglamentación de la profesión.

Así las cosas, el Colegio de CPA se opuso a la moción de sentencia sumaria que presentó el Estado y solicitó que se dictara sentencia sumaria a su favor. De entrada, el Colegio validó los hechos materiales que tanto el Estado como los demandantes señalaron como incontrovertidos. Sin embargo, expuso 60 hechos adicionales que entendía que no estaban en controversia. Entre estos, destacó como hechos incontrovertidos que la Junta de Contabilidad: (i) está compuesta por cinco (5) miembros nombrados por el Gobernador, pero actualmente hay tres vacantes; (ii) no cuenta con presupuesto propio para descargar las funciones que se le han delegado; y (iii) no cuenta con una oficina o espacio formal para reunirse mensualmente, por lo que le debe solicitar al Departamento de Estado un salón para llevar

a cabo sus reuniones. Sustentó lo anterior en las declaraciones juradas de cuatro personas que han ocupado la Presidencia de la Junta de Contabilidad.[2] Ante esta realidad, explicó que la Junta de Contabilidad era inoperante, incluso, delega en otras entidades —como el Colegio de CPA y la *National Association of State Boards of Accountancy* (NASBA)— todas las funciones permisibles. Así, razonó que, en la medida en que la Junta de Contabilidad carecía de la capacidad para fiscalizar adecuadamente el desempeño profesional de los CPA, eliminar la colegiación compulsoria implicaba dejar a la ciudadanía sin entidad alguna que velara por sus intereses en ese renglón.

De igual forma, el Colegio argumentó en su oposición que la colegiación compulsoria de los contadores públicos presentaba una situación distinta a la de otros colegios profesionales ya que, en este caso, estaba involucrado el derecho a la intimidad de terceros. Explicó que la Ley Núm. 75-1973, supra, disponía que los CPA remitirán al Colegio de CPA un Índice de Bitácora de las opiniones, informes o certificaciones que hayan emitido hasta el momento de radicación. Ese estatuto le faculta a inspeccionar, no solo el índice, sino los informes emitidos y los documentos de

---

[2] Véase: Declaración jurada del Sr. Bernardo Bravo Acosta Presidente de la Junta de Contabilidad entre el 2012 y el 2013, *Apéndice de la apelación*, págs. 121-123; Declaración jurada del Sr. Francisco Fernández Nieves Presidente de la Junta de Contabilidad desde el 2019, *Apéndice de la apelación*, págs. 124-126; y Declaración jurada del Sr. Kermit Lucena Zabala Presidente de la Junta de Contabilidad entre el 2003 y el 2007, *Apéndice de la apelación*, págs. 127-129; Declaración jurada del Sr. Aníbal Jover Pages Presidente de la Junta de Contabilidad entre el 2009 y el 2012, *Apéndice de la apelación*, págs. 187-188.

trabajo del contable que apoyan los informes a los fines de confirmar la calidad y el trabajo de los miembros de la profesión. Los documentos que se otorgan ante un contador contienen información confidencial sobre los cuales el cliente tiene una expectativa razonable de intimidad. Por eso, el proceso de revisión de documentos de terceros que realiza el Colegio no puede entregarse a la Junta de Contabilidad por tratarse de la inspección de documentos privados. Permitirlo conllevaría que se ponga en manos del Estado información confidencial de clientes, lo que atentaría contra su derecho contra registros y allanamientos irrazonables. De esa manera, el Colegio alegó que tener jurisdicción sobre todos los contadores públicos no solo era indispensable para llevar a cabo adecuadamente el trabajo de supervisión de la profesión, sino que era necesario para salvaguardar el derecho a la intimidad de los clientes. Por lo tanto, cualquier derecho a no asociarse al Colegio de CPA debía ceder ante el derecho a la intimidad de los clientes. Finalmente, solicitó que se denegara la moción de sentencia sumaria que presentó el Estado y, en cambio, se dictara sentencia sumaria a su favor disponiendo la constitucionalidad de la colegiación compulsoria de los CPA.

Atendidas las mociones de las partes, el Tribunal de Primera Instancia dictó una Sentencia. De entrada, debemos señalar que el foro primario se limitó a identificar 8 hechos incontrovertidos. Nada dispuso o expresó en cuanto al resto de los hechos mencionados por las partes. A tono con estos,

el tribunal concluyó que el Colegio no logró establecer un interés apremiante que justificara vulnerar el derecho de libertad de asociación de los demandantes ni logró probar que la colegiación compulsoria era la alternativa menos onerosa. Explicó que, de acuerdo con la Ley Núm. 293-1945, supra, el Estado aseguraba que los contadores públicos cumplieran con las disposiciones que regulan la profesión a través de la Junta de Contabilidad, siendo ese el mecanismo menos oneroso. Añadió que la colegiación compulsoria no es necesaria para proteger el derecho a la intimidad de los clientes debido a que el deber de custodiar los documentos de trabajo era del CPA y no de la Junta ni del Colegio.

Por otro lado, el foro primario expresó que, a su juicio, la alegación de incapacidad presupuestaria de la Junta de Contabilidad no podía constituir una justificación para vulnerar el derecho de libertad de asociación mediante la colegiación compulsoria. Razonó que la Junta tenía facultades delegadas por ley y las debía cumplir. Sin embargo, el tribunal omitió analizar si, a la luz de la evidencia presentada, la Junta estaba capacitada para supervisar la profesión y cumplir con sus facultades, lo que podría afectar el interés apremiante del Estado de mantener los altos estándares de calidad. Analizado lo anterior, el foro primario declaró ha lugar la moción de sentencia sumaria que presentó el Estado y declaró inconstitucional

la colegiación compulsoria en controversia.[3]

Inconforme, el Colegio recurrió al Tribunal de Apelaciones. De entrada, señaló que el foro primario ignoró por completo los hechos materiales incontrovertidos que plantearon las partes, los cuales eran medulares para realizar un análisis completo de la controversia. Además, que tampoco llevó a cabo el análisis de escrutinio estricto que requería el asunto planteado.

Por un lado, el Colegio recalcó que, contrario a lo que expresó el foro primario, existía un claro interés apremiante del Estado de supervisar adecuadamente la profesión. Esto era así particularmente en este caso porque sin la supervisión adecuada de los CPA se disminuye la confianza en la veracidad y corrección de las transacciones financieras. Asimismo, alegó que la colegiación compulsoria era el medio menos oneroso para cumplir ese interés. Al respecto, argumentó que el Colegio no era un mero espejo de la Junta ya que tenía facultades y obligaciones adicionales para regular la profesión que no las podía llevar a cabo el ente gubernamental sin incidir sobre el derecho de intimidad de terceras personas. Así, reiteró que la facultad de inspeccionar los trabajos de los CPA fue delegada por ley al Colegio a través de la revisión de bitácoras.

Cónsono con ello, se argumentó que el proceso de revisión de bitácoras que dispone el Art. 11A de la Ley Núm.

---

[3] Específicamente, se declararon inconstitucionales los artículos 2(h), 3, 4 y 9 de la Ley Núm. 75-1973.

75-1973, _supra_, —aparte de que fue delegado expresamente al Colegio de CPA— no era una tarea que podía llevar a cabo la Junta sin violar el derecho a la intimidad de los clientes. La revisión de opiniones, informes y certificaciones podía implicar necesariamente que se revisaran documentos de trabajo del contador, los cuales contenían información sensitiva sobre los clientes quienes tenían una expectativa razonable de intimidad sobre esos datos. No se trataba, pues, de que se le traspasaría al Estado la custodia de los documentos como entendió el tribunal de instancia, sino su revisión. Por ello, el Colegio sostuvo que tener jurisdicción sobre todos los CPA —vía la colegiación compulsoria— era indispensable no solo para llevar a cabo adecuadamente la supervisión ética de la práctica, sino para salvaguardar el derecho a la intimidad de los clientes.

De igual forma, el Colegio explicó que, además, era la entidad administradora del programa de revisión de calidad que promueve el _American Institute of Certified Public Accountants_ (AICPA). Este programa no es del tipo que tradicionalmente lleva a cabo el Estado; sino que es una actividad que realizan los mismos contadores y que es supervisada por una entidad independiente al Estado. Se identifica como una modalidad de _peer review_ que exige la profesión para asegurar la calidad uniforme del trabajo de los contadores. Consiste en una auditoría de las certificaciones, los informes y las opiniones que emiten los contadores con referencia a sus documentos de trabajo. En

Puerto Rico, la entidad designada por el AICPA para supervisar el programa de *peer review* es el Colegio de CPA. A modo comparativo, el Colegio mencionó que en otras jurisdicciones de Estados Unidos el Estado le delega esa revisión de calidad a entidades análogas al Colegio. En otras palabras, al igual que en Puerto Rico, los CPA en otras jurisdicciones están obligados a pagarle a las entidades correspondientes a quienes se les ha delegado la gestión del programa de *peer review.*

Por su parte, ante el foro apelativo intermedio los demandantes arguyeron que el Colegio no alegó hechos suficientes para probar las exigencias del análisis constitucional aplicable a esta controversia, por tanto, fue correcta la decisión del Tribunal de Primera Instancia. En particular, alegaron que no bastaba con que el Estado tuviera un interés apremiante para lesionar un derecho fundamental, sino que también era necesario probar que no existían mecanismos menos onerosos para cumplir ese fin. A tono con ello, argumentaron que existía una Junta de Contabilidad con facultades investigativas, fiscalizadores, disciplinarias y de licenciatura con relación a los CPA, lo que la convertía en el medio menos oneroso para adelantar cualquier interés del estado respecto a estos profesionales. Específicamente, sostuvieron que "existen otros medios para lograr los intereses perseguidos, a saber, darles las facultades y los fondos a la Junta Examinadora en cuestión, o, proveer recursos públicos al Colegio como se hace con tantas

entidades sin fines de lucro, sin obligar a los demandantes a pertenecer a una organización en la que no creen". *Alegato de la parte recurrida-apelada*, pág. 8. Además, los demandantes plantearon que, si bien el Colegio era el ente designado por el AICPA para coordinar el programa de revisión de calidad (*peer review*) en Puerto Rico, nada impedía que los contadores cumplieran con el programa sin ser colegiados.

A su vez, el Estado compareció ante el Tribunal de Apelaciones. Allí, enfocó su postura inicial sobre la constitucionalidad de la colegiación compulsoria de los CPA. Razonó que el esquema regulatorio compuesto por el Colegio de CPA y la Junta de Contabilidad revela una situación fáctica distinguible de aquella en el caso de Rodríguez Casillas *et al.* v. Colegio, supra. Por ello, planteó que la colegiación compulsoria aquí en controversia pudiera superar el crisol constitucional toda vez que hay obligaciones exclusivamente designadas por ley al Colegio de CPA que no se pueden transferir a la Junta de Contabilidad.

Evaluadas las posturas de las partes, el Tribunal de Apelaciones emitió una Sentencia mediante la cual confirmó el dictamen recurrido. Entendió que el foro primario no erró al descartar los hechos propuestos por el Colegio en la oposición a sentencia sumaria porque "no son esenciales para la solución del litigio". *Sentencia*, Apéndice de la *Apelación*, pág. 342. Sin embargo, reconoció que se trataba de hechos que sustentaban las alegaciones del Colegio sobre

la situación fiscal de la Junta de Contabilidad. Por otro lado, aunque entendió que el Estado tenía un interés apremiante de regular la profesión de contador público y de garantizar la confidencialidad de la información que estos manejan, expresó que existían medidas menos onerosas para proteger ese interés. Al igual que el foro primario, el Tribunal de Apelaciones razonó que la Junta de Contabilidad tenía todas las facultades delegadas por ley para asegurar la calidad del trabajo de los contadores públicos y el cumplimiento ético de estos profesionales.

Inconforme, el Colegio de CPA recurre ante este Tribunal mediante un recurso de apelación. En esencia, reitera los argumentos que levantó ante el Tribunal de Apelaciones y se sostiene en sus alegaciones sobre la constitucionalidad de la colegiación compulsoria de los CPA. Por su parte, al igual que ante el foro apelativo intermedio, el Estado resalta que este asunto se puede distinguir del caso de Rodríguez Casillas *et al.* v. Colegio, supra, porque el Colegio de CPA ejerce funciones que no se le pueden delegar a la Junta de Contabilidad. Finalmente, los demandantes sostienen que las disposiciones que les obligan a formar parte del Colegio de CPA son inconstitucionales porque existen medidas menos onerosas para que el Estado regule la profesión.

Este Tribunal celebró una vista oral el 7 de febrero de 2023. Tras el intercambio que allí se suscitó, quedé plenamente convencida de la constitucionalidad de la

colegiación compulsoria aquí impugnada. En ese sentido, procedo a delinear el marco jurídico aplicable.

## II.

### A. Derecho a la libre asociación

El reclamo de los demandantes es que la colegiación compulsoria viola impermisiblemente su derecho de libertad de asociación. La Constitución de los Estados Unidos no contiene una referencia textual a este derecho. La protección constitucional atribuida a la libertad de asociación en la esfera federal proviene de la jurisprudencia. Ahora bien, a diferencia de la Constitución de Estados Unidos, nuestra Carta Magna establece que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. ELA, LPRA, Tomo 1, ed. 2016. Es decir, la libertad de asociación es un derecho fundamental reconocido expresamente en nuestra Constitución. Así, nuestros constituyentes procuraron proveer una protección más amplia a este derecho fundamental que aquella reconocida bajo la Constitución de Estados Unidos. Rodríguez Casillas et al. v. Colegio, supra.

Nótese que la garantía constitucional a la libre asociación se estableció en términos positivos. Sin embargo, se ha aclarado que la protección presupone también una vertiente negativa, es decir, un derecho a no asociarse. Rodríguez Casillas et al. v. Colegio, supra; Rivera Schatz v. ELA y C. Abo. PR II, supra. De igual forma, debemos

recalcar que no estamos ante un derecho absoluto. P.N.P. v. De Castro Font II, 172 DPR 883 (2007); P.A.C. v. ELA I, 150 DPR 359 (2000); Democratic Party v. Tribunal Electoral, 107 DPR 1 (1978). Esto significa que puede ceder ante intereses de mayor jerarquía por parte del Estado.

Cónsono con lo anterior, el primer paso para determinar si la actuación del Estado excede las garantías constitucionales es evaluar si se infringe sustancialmente algún derecho fundamental. Si se determina que el Estado infringe sustancialmente un derecho fundamental, entonces la actuación estatal se debe analizar a la luz de un escrutinio estricto. E. Chemerinsky, Constitutional Law Principles and Policies, 5ta ed., Nueva York, Ed. Walter Kluwer, 2015, pág. 826 ("The Supreme Court has held that some liberties are so important that they are deemed to be 'fundamental rights' and that generally the government cannot infringe upon them unless strict scrutiny is met"). Siendo la libertad de asociación un derecho fundamental expresamente reconocido en nuestra Constitución, cualquier acción de Estado que atente contra ese derecho está sujeta a un escrutinio estricto. Rodríguez Casillas et al. v. Colegio, supra; Rivera Schatz v. ELA y C. Abo. PR II, supra.

Este escrutinio impone el nivel más riguroso de revisión de una legislación impugnada y presupone la inconstitucionalidad de la medida. Rodríguez Pagán v. Dpto. de Servicios Sociales, 132 DPR 617, 635 (1993); Rodríguez Rodríguez v. ELA, 130 DPR 562 (1992). Esto significa que el

peso de la prueba recae en el Estado a quien le corresponde demostrar que la medida impugnada es válida. Ib. Para que un acto estatal se sostenga bajo esta metodología de adjudicación constitucional, el Estado deberá probar dos criterios respecto a la medida impugnada: (1) que sirve un interés apremiante del Estado y (2) que es la alternativa menos onerosa para lograr ese interés. Rodríguez Casillas *et al.* v. Colegio, supra; Rivera Schatz v. ELA y C. Abo. PR II, supra.

El escrutinio estricto es una fórmula elaborada jurisprudencialmente para proteger derechos fundamentales que son de la más alta categoría, pero no absolutos.[4] Su aplicación suele ser compleja porque no se han pautado –a nivel estatal ni federal– guías exactas para concluir qué constituye un interés apremiante del Estado o qué medida es la menos onerosa para adelantar determinado interés.[5] Esa complejidad surge precisamente porque se trata de un examen de proporcionalidad que pone a prueba la capacidad y la forma en que el Estado protege determinados intereses cuando ello

---

[4] R.H. Fallon, Jr., Strict Judicial Srutiny, 54 UCLA L. Rev. 1267, 1270 (2007) ("[S]trict judicial scrutiny —which is a generic constitutional test capable of broad application— rose to prominence as the solution to a generic problem […]. That problem involved the crafting of formulas to protect "preferred" or fundamental rights that were too important to be enforced only by a rational basis test, but that the Supreme Court could not reasonably define as wholly categorical or unyielding.").

[5] E. Chemerinsky, Constitutional Law Principles and Policies, 5ta ed., Nueva York, Ed. Walter Kluwer, 2015, pág. 831 ("The Supreme Court has never articulated criteria for determining whether a claimed purpose is to be deemed 'compelling'") ("There is no formula for deciding whether a means is necessary or whether a less restrictive means can suffice").

interfiere con algún derecho fundamental.[6] Por lo anterior, para un análisis completo y sopesado de la controversia ante nos, debemos discutir brevemente algunos detalles sobre los criterios del escrutinio estricto.

En primer lugar, debemos considerar el criterio de interés gubernamental. Por la propia naturaleza del escrutinio estricto, es forzoso reconocer que no se trata de cualquier interés del Estado. Más bien, el fin gubernamental que permitiría vulnerar un derecho fundamental es aquel que sea apremiante. Rodríguez Casillas *et al.* v. Colegio, supra; Rivera Schatz v. ELA y C. Abo. PR II, supra. Es decir, de la mayor importancia o mayor jerarquía. Véase Rodríguez Rodríguez v. ELA, 130 DPR 562, 581 (1992). No se trata, en contraste, de un interés legítimo el cual basta para un examen de razonabilidad ni un interés importante que superaría un escrutinio intermedio.[7]

---

[6] Resulta pertinente mencionar lo que han expresado algunos juristas al respecto. Según mencionamos, el escrutinio estricto es el *test* constitucional más riguroso. En su obra, el Profesor Erwin Chemerinsky hace referencia a una expresión del Profesor Gerald Gunther quien manifestó que este escrutinio es estricto en teoría, pero fatal en la práctica ("strict in theory and fatal in fact"). Chemerinsky, op. cit., pág. 567 (citando a Gerald Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972)). Ello, ante la observación de que, usualmente, cuando se aplica este estándar de adjudicación, la ley impugnada no sobrevive el *test*. Ib. Ahora bien, el desarrollo histórico de esta metodología y el problema que se buscaba resolver con ella, reflejan que su propósito era crear una fórmula adjudicativa para invalidar estatutos que impusieran una carga sustancial en un derecho fundamental indebidamente, **pero a su vez permitiera validar aquellos estatutos que buscaran proteger un interés vital del Estado.** En otras palabras, no siempre que se afecte un derecho fundamental o se aplique el escrutinio estricto va a declararse inconstitucional un estatuto. De ser así, las cortes estarían reconociendo que determinados derechos fundamentales son absolutos.

[7] Fallon, supra, pág. 1273 ("When the modern formula developed, the demand for a compelling interest contrasted with a background assumption

Una vez se decide que existe un interés apremiante del Estado que justifica la medida, en segundo lugar, corresponde evaluar si esa es la medida menos onerosa para proteger ese interés. Rodríguez Casillas v. Colegio de Tec. Mec., supra; Rivera Schatz v. Colegio de Abogados, supra. Eso significa, según la jurisprudencia, que el acto impugnado es necesario para conseguir el interés apremiante que el Estado identificó. Chemerinsky, op. cit., pág. 567. Véase como ejemplo: Adarand Constructors v. Pena, 515 US 200 (1995); Sugarman v. Dougall, 413 US 634 (1973); Sherbert v. Verner, 374 US 398 (1963). Para ello, el Estado deberá probar que no tiene a su alcance medidas para cumplir ese fin que sean menos restrictivas o que lesionen en menor grado el derecho fundamental invocado. Chemerinsky, op. cit., pág. 567. Lo anterior, pues se presupone que, si existen medidas menos invasivas para lograr el interés apremiante del Estado, entonces la legislación impugnada no es necesaria. Ib. Ahora bien, **una legislación que lesione un derecho fundamental se torna necesaria si, aun existiendo una medida menos restrictiva, esta no funciona para hacer valer el fin del estado.** Ib., pág. 831 ("The government's burden when there is an infringement of a fundamental right is to prove

---

that legislation would ordinarily be upheld as long as rationally related to any legitimate state interest. Today, the requirement of a compelling interest also contrasts with an intermediate form of scrutiny under which the government, in defending challenged legislation, must point to an interest that is "important." Within this hierarchy, compelling interests stand at the top. The overall doctrinal structure presupposes that such interests are not only extremely weighty, possibly urgent, but also rare--much rarer than merely legitimate interests and rarer too than important interests.")

that no other alternative, less intrusive of the right, can work"). Es decir, para concluir que existen medidas menos onerosas es forzoso evaluar la viabilidad y efectividad de las medidas alternativas. Solo así se puede determinar que el Estado tiene a su alcance maneras para adelantar su interés apremiante sin vulnerar un derecho fundamental.[8]

**B. Ley de la Junta de Contabilidad y Ley del Colegio de CPA**

Por virtud del poder de razón del Estado (*police power*) la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones a los fines de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. Rodríguez Casillas *et al.* v. Colegio, supra; Matos v. Junta Examinadora, 165 DPR 741 (2005). En el ejercicio de esa facultad y con el propósito de reglamentar la práctica de la contabilidad pública, la Asamblea Legislativa promulgó la Ley Núm. 293-1945, supra.

A través de esta ley se creó la Junta de Contabilidad con cinco miembros nombrados por el Gobernador quienes, entre otros requisitos, deben poseer certificados de contador público autorizado y estar activos en la práctica de la profesión. 20 LPRA sec. 773. La Junta tiene diversas facultades delegadas por ley, entre ellas: (i) promulgar y modificar las reglas de ética profesional y los reglamentos

---

[8] Sobre la efectividad de las medidas, Fallon menciona un dato interesante y es que, típicamente cualquier medida alterna que en teoría es menos restrictiva al derecho fundamental, es probablemente menos efectiva en la práctica. Fallon, supra, pág. 1331 ("Typically if not invariably, however, any alternative that is less restrictive in theory is also likely to be less effective in fact.").

de educación continua necesarios para mantener un alto nivel de integridad y dignidad en la profesión de contabilidad pública; (ii) expedir los certificados de acreditación y licencias a aquellos CPA que cumplan con los requisitos; (iii) renovar, revocar o suspender cualquier certificado o licencia expedida; (iv) ofrecer exámenes de reválida; (v) iniciar y llevar a cabo procedimientos disciplinarios *motu proprio*, mediante querella sometida por el Colegio de CPA o por cualquier ciudadano; (vi) recurrir al tribunal para solicitar remedios en contra de una persona que practique ilegalmente la profesión de contabilidad pública, e (vii) imponer multas administrativas que no excedan de $1,000. 20 LPRA secs. 774, 779-781.

Años más tarde, la Asamblea Legislativa creó el Colegio de Contadores Públicos Autorizados de Puerto Rico por virtud de la Ley Núm. 75-1973, supra. Esta ley ordenó la colegiación compulsoria de los contadores públicos en su artículo 3 al disponer que, "la Junta de Contabilidad no expedirá o renovará licencia para ejercer la profesión de Contador Público Autorizado a ninguna persona que no sea miembro del Colegio". 20 LPRA sec. 795. Además, la ley le concedió al Colegio de CPA facultad:

> (a) Para subsistir a perpetuidad bajo ese nombre.
> (b) Para demandar y ser demandado, como persona jurídica.
> (c) Para poseer y usar un sello que podrá alterar a su voluntad.
> (d) Para adquirir derechos y bienes, tanto muebles como inmuebles, por donación, legado, tributos entre sus propios miembros, compra o de otro modo;

y poseerlos, hipotecarlos, arrendarlos y disponer de los mismos en cualquier forma.

(e) Para tomar dinero a préstamo y constituir garantías para el pago de los mismos.

(f) Para adoptar su reglamento, que será obligatorio para todos los miembros, y para enmendarlo en la forma y con los demás requisitos que más adelante se establecen.

(g) **Para velar por el cumplimiento de los cánones de ética profesional** que para regir la conducta de los contadores públicos autorizados haya adoptado o en el futuro adopte la Junta de Contabilidad de Puerto Rico.

(h) **Para recibir e investigar las querellas que se formulen respecto a la práctica y/o conducta de los miembros en el ejercicio de la profesión; celebrar vistas en las que se dará oportunidad al miembro afectado o a su representante de someter hojas de trabajo u otra evidencia pertinente; llevar querellas ante la Junta de Contabilidad para la acción correspondiente.** Nada de lo dispuesto en este inciso se entenderá en el sentido de limitar o alterar las facultades de la Junta de Contabilidad de Puerto Rico.

(i) Para proteger a sus miembros en el ejercicio de la profesión y promover su desarrollo profesional; asimismo, para disponer la creación de sistemas de seguros y fondos especiales y otros medios de protección voluntaria.

(j) Para ejercitar las facultades incidentales que fueren necesarias o convenientes a los fines de su creación y funcionamiento que no estuvieren en desacuerdo con esta Ley. 20 LPRA sec. 794 (Énfasis suplido).

Asimismo, se le delegaron las obligaciones siguientes:

(a) Contribuir al adelanto y desarrollo de la contabilidad pública.

(b) Elevar y mantener la dignidad de la profesión y sus miembros.

(c) Defender los derechos e inmunidades de los contadores públicos autorizados.

(d) Establecer relación o afiliación con asociaciones análogas de Estados Unidos u otros países dentro de determinadas reglas de solidaridad y cortesía.

(e) Determinar medidas de protección mutua y, estrechar los lazos de amistad y compañerismo entre los miembros del Colegio.

(f) Cooperar con los Gobiernos Federal, Estatal, Municipal y sus agencias e instrumentalidades en

todo cuanto sea de interés mutuo y beneficioso al bienestar general.
(g) Fomentar y sostener una elevada y estricta moral profesional entre los miembros del Colegio.
(h) Presentar ante el tribunal competente la acción civil que corresponda para hacer valer las disposiciones de la Ley Núm. 293 de 15 de mayo de 1945, según enmendada, o de la Ley Núm. 75 de 31 de mayo de 1973, según enmendada. 20 LPRA sec. 805.

Entre otras atribuciones, el Colegio de CPA puede cobrar una cuota anual que deberán pagar sus miembros. 20 LPRA sec. 800. Disponiéndose que la Junta de Contabilidad podría suspender a cualquier miembro que no pague la cuota. 20 LPRA sec. 801. También, se autorizó al Colegio de CPA a vender sellos oficiales del colegio por un valor no mayor de cinco dólares. 20 LPRA sec. 803. Estableciéndose que ningún CPA o firma de CPA emitiría una opinión, informe o certificación sin haber adherido en el original uno de estos sellos y hacer constar en todas las copias adicionales el número de identificación del sello original. 20 LPRA sec. 802. Como colorario de lo anterior, se le impuso a los CPA y a las firmas de CPA la obligación de llevar un Índice de Bitácoras que, como parte de la revisión de calidad, debe remitirse al Colegio de CPA. Específicamente, el Art. 11A de la Ley Núm. 75-1973, _supra_, establece que:

Los contadores públicos autorizados o firma de contadores públicos autorizados remitirán al Colegio de Contadores Públicos Autorizados de Puerto Rico el Índice de Bitácora informando las opiniones, informes o certificaciones emitidas hasta la fecha de radicación. El Índice de Bitácora se rendirá en conjunto con el pago de las cuotas dispuestas en el Artículo 8 de esta Ley, aunque el Colegio de Contadores Públicos podrá requerir radicaciones periódicas. De no haber emitido

certificaciones u opiniones durante el año, los contadores públicos autorizados o firma de contadores públicos autorizados enviarán al Colegio un informe negativo para dicho año.

El Índice de Bitácora hará constar la siguiente información:
(a) El número de la estampilla correspondiente al informe;
(b) si el informe fue emitido a persona natural o jurídica, y en el caso de la última el tipo de persona jurídica, y
(c) la fecha y descripción del informe.

El Colegio queda autorizado a fijar una cuota adicional para sufragar los gastos relacionados al **mantenimiento y supervisión** de los Índices de Bitácoras. Dicha cuota se fijará en una base proporcional a las anotaciones al Índice de Bitácora y tomará efecto únicamente previa aprobación por mayoría del quórum reglamentario para una Asamblea General o Extraordinaria. 20 LPRA sec. 803a (Énfasis suplido).

Nótese que el deber del Colegio de CPA no es mantener récord de los Índices de Bitácora únicamente, sino que debe supervisarlos. Cabe mencionar, además, que el Colegio de CPA es la única entidad designada por el AICPA para administrar el programa de *peer review* en Puerto Rico.[9]

**C. Sentencia sumaria**

El mecanismo procesal de sentencia sumaria permite resolver controversias sin la celebración de un juicio. Pérez Vargas v. Office Depot, 203 DPR 687 (2019). Este busca propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales. Ib.

---

[9] Véase:https://us.aicpa.org/interestareas/peerreview/community/links/pr administeringentities (última visita, 13 de marzo de 2023).

Se podrá dictar sentencia sumaria si de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, surge que no hay controversia real sustancial en cuanto a un hecho esencial y pertinente, y que, como cuestión de derecho, se debe dictar sentencia sumaria a favor de la parte promovente. Regla 36.3 (e) de Procedimiento Civil, 32 LPRA Ap. V; Pérez Vargas v. Office Depot, supra.

La Regla 36.3 de Procedimiento Civil, supra, establece los requisitos de forma que deben cumplir tanto el promovente como el opositor de una sentencia sumaria. En lo pertinente, en una moción de sentencia sumaria el promovente deberá consignar una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial con indicación directa de las declaraciones juradas u otra prueba admisible donde se establecen los hechos. Regla 36.3 (a)(4) de Procedimiento Civil, supra. Similarmente, en la contestación a la moción de sentencia sumaria, el opositor deberá presentar una relación de hechos que están en controversia y una enumeración de aquellos hechos que no están en controversia. Regla 36.3 (b)(2) y (3) de Procedimiento Civil, supra. Lo anterior, con indicación a las declaraciones juradas o prueba admisible que los sustenten. Ib. Es decir, las alegaciones en un proceso de sentencia sumaria se pueden sustentar tanto en prueba documental como en declaraciones juradas. Al respecto, la

Regla 36.5 de Procedimiento Civil, supra, dispone que, "las declaraciones juradas para sostener u oponerse a la moción se basarán en el conocimiento personal del o de la declarante. Contendrán aquellos hechos que serían admisibles en evidencia y demostrarán afirmativamente que el o la declarante está cualificado para testificar en cuanto a su contenido".

Conforme a las alegaciones y la prueba, si el juzgador entiende que no existe controversia sobre hechos materiales del pleito, entonces procede aplicar el derecho. Pérez Vargas v. Office Depot, supra.

### III.

En su recurso de apelación, el Colegio solicitó que este Tribunal revisara la determinación del foro apelativo intermedio que confirmó la inconstitucionalidad de la colegiación compulsoria de los CPA. Señaló como error que no se analizaron adecuadamente los hechos particulares que enmarcan esta controversia a la luz del escrutinio estricto. Por una parte, sostuvo que el Estado tenía un interés apremiante de reglamentar y regular la profesión de CPA, pero además tenía el interés de proteger la confidencialidad de la información que manejan los CPA. Según alegó, este interés adicional se protegía con las funciones de supervisión delegadas exclusivamente al Colegio de CPA y que el Estado no podía realizar. Por lo mismo, criticó que el tribunal haya entendido que la Junta de Contabilidad era el

mecanismo menos oneroso para proteger el interés apremiante del Estado.

Por su parte, los demandantes arguyeron que el decreto de inconstitucionalidad de la colegiación compulsoria de CPA fue correcto toda vez que el Estado no alegó un interés apremiante ni demostró que esa fuera la medida menos onerosa para adelantar algún interés. En todo caso, alegaron que la Junta de Contabilidad tenía la facultad para reglamentar y supervisar todo el desempeño de los contadores públicos, por lo que ese era el mecanismo menos oneroso. Finalmente, aclararon que el programa de control de calidad (*peer review*) no era una exigencia estatal, sino que era una actividad privada que el AICPA le requería determinados CPA para mantener estándares uniformes de la profesión a nivel nacional. Así, explicaron que no es requisito ser miembro de una entidad administradora para cumplir con el programa.

Con planteamientos similares al Colegio de CPA compareció el Estado, quien alegó que los hechos particulares de la colegiación compulsoria de los CPA eran distinguibles de los que se evaluaron en <u>Rodríguez Casillas</u> *et al.* v. <u>Colegio</u>, supra. Así, argumentó que las controversias sobre colegiación compulsoria no se debían analizar de forma uniforme, pues cada profesión tenía escenarios particulares. La postura del Estado en el contexto de los contadores públicos es que la colegiación compulsoria supera el crisol constitucional porque la Junta

de Contabilidad no es un medio viable para regular la profesión de los contadores públicos.

Según se detalló anteriormente, corresponde analizar esta controversia a la luz de un escrutinio estricto por estar involucrado el derecho fundamental de la libre asociación. Esta metodología adjudicativa es la más exigente pues presume la inconstitucionalidad de la medida impugnada, en este caso, la colegiación compulsoria de los CPA. Además, el Estado tiene el peso de demostrar que la legislación es necesaria para adelantar un interés apremiante. Procedo a evaluar cada uno de los criterios de este escrutinio.

Por un lado, los demandantes plantearon que el Estado no alegó, ni mucho menos demostró, que perseguía un interés apremiante con la colegiación compulsoria de los CPA. A mi juicio, se equivocan en este aspecto. Primero, como cuestión de derecho, esta Curia ha establecido que el Estado tiene un interés apremiante de regular las profesiones a los fines de que se le provean a la ciudadanía servicios de alta calidad y competencia.[10] Por eso, en <u>Rodríguez Casillas *et al.* v.</u>

---

[10] Destaco lo que se expresó a esos fines en <u>Rodríguez Casillas *et al.* v. Colegio</u>, 202 DPR 428, 439-440 (2019):

"Toda comunidad políticamente organizada tiene un poder de razón de Estado (*police power*), que es utilizado por la Asamblea Legislativa para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad. *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 36 (2010). En el ejercicio de ese poder, la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones, salvo la jurídica, a fin de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. <u>Accurate Sols. v. Heritage Environmental</u>, 193 DPR 423, 434 (2015); <u>Matos v. Junta Examinadora</u>, 165 DPR 741, 755 (2005)".

Colegio, supra, se reconoció que el Estado tenía un interés apremiante de seguridad pública. Segundo, el Colegio de CPA desde el comienzo del pleito ha identificado que el Estado tiene un interés apremiante de supervisar la profesión de los CPA y, además, garantizar el derecho a la intimidad de los clientes respecto a la información que le brindan a los contadores. En todo caso, en la vista oral que se celebró, el Estado —quien tiene el peso de demostrar que tiene un interés apremiante— reafirmó de forma clara y contundente que existe tal interés. Por tanto, no hay controversia en cuanto a que se cumple el primer criterio del escrutinio estricto. Analicemos, entonces, el segundo criterio, a saber: si la colegiación compulsoria es la forma menos onerosa de cumplir ese interés.

Como vimos, para que un acto estatal impugnado sobreviva el análisis constitucional de escrutinio estricto, el Estado debe demostrar que no tiene otro medio menos restrictivo al derecho fundamental invocado para adelantar su interés apremiante. En otras palabras, que la medida es necesaria porque no hay otra forma menos onerosa de hacer valer ese interés. Este análisis requiere evaluar si existen otras alternativas y si esas alternativas funcionan para conseguir ese fin. Lo anterior, pues si las alternativas no son efectivas para adelantar el interés invocado, entonces la medida impugnada supera el escrutinio constitucional por ser necesaria.

Los foros recurridos —al igual que los demandantes— entienden que la colegiación compulsoria de los CPA es inconstitucional porque existe una Junta de Contabilidad con todas las facultades necesarias para regular la profesión, siendo ese el mecanismo menos oneroso. Destacan que la Ley Núm. 293-1945, <u>supra</u>, le confiere a la Junta la capacidad de expedir, suspender y revocar licencias; otorgar exámenes de reválida; promulgar las normas de ética profesional y las de educación continua; investigar querellas; y disciplinar a los CPA. De hecho, razonan que es la Junta de Contabilidad y no el Colegio de CPA quien posee la autoridad para emitir determinaciones disciplinarias finales. Así, plantean que el interés apremiante del Estado en cuanto a estos profesionales se puede conseguir a través de la Junta, siendo ese un mecanismo que restringe en menor grado el derecho de libertad de asociación en comparación con la colegiación compulsoria. Como se verá, los foros inferiores erraron en su conclusión puesto que omitieron evaluar si la Junta, en efecto, es una medida menos onerosa **que funciona** para cumplir el objetivo gubernamental.

A través de todo el proceso apelativo de este caso, el Colegio de CPA ha reclamado que el foro primario prescindió de varios hechos incontrovertidos que se propusieron y sustentaron en la oposición a la solicitud de sentencia sumaria, los cuales son indispensables para evaluar la viabilidad de la Junta de Contabilidad como medida alternativa. Como se sabe, se puede dictar sentencia sumaria

cuando de las alegaciones y la evidencia surja que no existe controversia real y sustancial en cuanto a un hecho material y que, como cuestión de derecho, procede dictar sentencia. Regla 36.3(e) de Procedimiento Civil, supra. En este caso, el Tribunal de Primera Instancia erró al ignorar los hechos incontrovertidos que propuso y evidenció el Colegio respecto al desempeño de la Junta de Contabilidad. Según surge de las declaraciones juradas de cuatro Presidentes de la Junta – las cuales se presentaron junto a la oposición de sentencia sumaria–, esa entidad está inoperante actualmente. No tiene la capacidad administrativa ni presupuestaria para atender los reclamos disciplinarios en contra de los CPA ni hacer valer las normas de ética profesional. Ni siquiera se encarga de proveer el examen de reválida.

De igual forma, en la vista oral celebrada en este caso, el Estado planteó que la Junta de Contabilidad no es una alternativa efectiva ni viable para fiscalizar la profesión por falta de presupuesto y de personal. Allí se indicó que en la actualidad la Junta solamente cuenta con dos de los cinco miembros que dispone la Ley Núm. 293-1945, supra. Además, se estableció que la Junta no tiene personal de apoyo, sino que depende del personal que comparte con otras juntas examinadoras dentro del Departamento de Estado para funcionar, ni tampoco tiene asignado el presupuesto para establecer un andamiaje organizacional que le permita realizar las funciones que realiza el Colegio de CPA. En fin, el Estado aclaró que la Junta de Contabilidad no es una

opción viable para ejercer las funciones de supervisión de los CPA porque simple y sencillamente no tiene los recursos ni las capacidades para hacerlo. Estos hechos esenciales -que forman parte del expediente y debieron considerarse al evaluar la moción de sentencia sumaria- evidencian que la Junta de Contabilidad no es una alternativa efectiva para cumplir con el interés apremiante de regular la profesión.

En cambio, años después de haber creado la Junta de Contabilidad, la Asamblea Legislativa creó el Colegio de CPA para robustecer la profesión de la contabilidad pública en Puerto Rico. La Ley Núm. 75-1973, _supra_, provee para que, entre otras cosas, el Colegio vele por el cumplimiento de los cánones de ética profesional. 20 LPRA sec. 794. Para ello, tiene la facultad de recibir e investigar las querellas que se formulen respecto al desempeño de miembros del Colegio en el ejercicio de la profesión. _Ib_.

Además, y en lo medular a esta discusión, la Ley Núm. 13 de 27 de abril de 1994 (Ley Núm. 13-1994) enmendó la Ley Núm. 75-1973, _supra_, a los fines de establecer un Índice de Bitácora en el Colegio de CPA. Este requisito se encuentra estatuido en el Art. 11A de la Ley Núm. 75-1973, _supra_, y obliga a todos los contadores públicos a someter un informe periódico ante el Colegio en el que declararán todas las opiniones, informes o certificaciones que hayan emitido hasta la fecha de radicación. Véase la Exposición de Motivos de la Ley Núm. 13-1994, _supra_. La revisión de bitácoras que dispone este artículo, aunque similar a la revisión de

calidad (*peer review*) que exige la AICPA, es un ejercicio independiente y de naturaleza estatutaria. Para fines estatales, los CPA no tienen que cumplir con el programa de *peer review* de la AICPA. Es decir, la Junta de Contabilidad no requiere que los CPA pertenezcan a un programa de *peer review* para obtener una licencia. Por eso, la Asamblea Legislativa estableció un sistema de revisión a cargo del Colegio cuyo propósito fue "darle fuerza de ley al requisito de mantener esa información, **en armonía con el interés público de que el Colegio de Contadores Públicos Autorizados de Puerto Rico contribuya a la excelencia y autoreglamentación de la profesión**". (Énfasis nuestro).

Conforme al Artículo 11A de la Ley Núm. 75-1973, supra, el Colegio tiene el deber de mantener y supervisar los Índices de Bitácora. Esta revisión conlleva inspeccionar las opiniones, los informes o las certificaciones que los CPA o firmas de CPA emiten a los fines de asegurar que se están realizando correctamente y acorde con los estándares de calidad de la profesión. Para ello, el Colegio puede examinar los documentos de trabajo del contador, los cuales contienen información privada de los clientes.[11] Ese ejercicio no es una actividad que la Junta de Contabilidad puede llevar a cabo sin vulnerar el derecho a la intimidad de los clientes. Lo anterior, pues se permitiría que el Estado revise datos

---

[11] Este proceso de inspección se puede comparar con las inspecciones de obras protocolares que realiza la Oficina de Inspección de Notarías (ODIN), con la distinción de que la ODIN examina instrumentos públicos y el Colegio de CPA revisa documentos privados.

financieros de particulares sobre los cuales se tiene una expectativa razonable de intimidad y cuya inspección -sin mediar las garantías correspondientes- pudiera tornarse en un registro o allanamiento ilegal.

Con base en el análisis anterior, es forzoso concluir que, si bien imponerle a la Junta de Contabilidad la responsabilidad exclusiva de regular la profesión de contabilidad pública restringiría menos el derecho de libertad de asociación de los demandantes que la colegiación compulsoria, esta no es una alternativa viable para adelantar el interés del Estado. La Junta no tiene la capacidad para llevar a cabo la supervisión ética de los CPA y tampoco puede realizar la revisión de bitácoras que se le delegó por mandato de ley al Colegio. Por lo tanto, no es un mecanismo menos oneroso para regular la profesión de contabilidad conforme a los estándares del escrutinio estricto.

Los demandantes plantean que otra alternativa menos onerosa es establecer una colegiación voluntaria, como ocurre en algunas jurisdicciones de Estados Unidos. Ese escenario, si bien implica eliminar cualquier interferencia con el derecho de libertad de asociación de los demandantes, presenta problemas en cuanto a garantizar el interés del Estado. Primero, con una matrícula voluntaria el Colegio de CPA no podría ejercer su jurisdicción sobre todos los CPA, sino únicamente en cuanto a sus miembros. Ese es precisamente el objetivo de una colegiación voluntaria; que sólo aquellos

interesados estén sujetos a la reglamentación de la entidad. Esto implica que el Colegio no podría ejercer su rol de revisión y supervisión sobre los CPA que no pertenezcan a la institución. Segundo, distinto a otras jurisdicciones de Estados Unidos, nuestra Junta de Contabilidad -según evidenciado en este caso- no funciona. Es decir, no tiene capacidad para cumplir con el interés de supervisar el trabajo de los CPA descolegiados. Así, si el Colegio no puede ejercer su jurisdicción sobre todos los CPA y la Junta tampoco puede supervisarlos, entonces no hay forma de cumplir con el interés apremiante del Estado de garantizar que la ciudadanía reciba servicios de contabilidad de la mejor calidad. Es decir, los CPA ejercerían sus funciones en ausencia un ente fiscalizador que revise su trabajo. Siendo esta una opción que no adelanta el interés apremiante del Estado, tampoco es una alternativa viable conforme al escrutinio estricto.

Recuérdese que, el escrutinio estricto se activa precisamente para auscultar si se justifica lesionar un derecho fundamental.[12] Se trata, pues, de evaluar si el derecho a no asociarse de los demandantes en este caso cede ante intereses de mayor importancia por parte del Estado. Conforme al análisis anterior, estimo que el Estado logró

---

[12] Fallon, *supra*, pág. 1333 ("The Court must determine whether infringements of constitutional rights, which can be more or less grievous, can be justified in view of the benefits likely to be achieved, the scope of infringement of protected freedoms, and the available alternatives").

demostrar que tiene un interés apremiante de regular la profesión de contabilidad pública en Puerto Rico y, además, que no hay forma de garantizar ese interés apremiante mediante una medida menos restrictiva a la libertad de asociación de los CPA.

Aunque en el contexto de otras profesiones esta Curia ha resuelto que los requisitos de colegiación compulsoria son inconstitucionales, es menester aclarar que no se trata de una norma uniforme ni automática. Estas controversias constitucionales requieren un análisis caso a caso, particularmente, de las medidas alternativas que tiene a su alcance el Estado para promover el interés apremiante de regular cada profesión. No se trata, pues, de concluir que la membresía obligatoria a un colegio profesional es inconstitucional siempre que exista una junta examinadora. Según se pudo apreciar en el caso de autos, si la Junta no es un medio viable o efectivo para adelantar el interés del Estado, entonces no es una alternativa que derrota el escrutinio estricto.

## IV.

Por los fundamentos que anteceden, estoy conforme con la Sentencia que hoy se emite, la cual valida la constitucionalidad de la colegiación compulsoria en disputa. En definitiva, en este caso, el medio menos oneroso para adelantar el interés estatal es el mantenimiento de la medida obligatoria que se legisló.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Félix Norman Román y otro<br><br>Apelados<br><br>v.<br><br>Colegio de Contadores Públicos Autorizados y otros<br><br>Apelantes | AC-2022-0026 | *Apelación* |

**Opinión de Conformidad emitida por el Juez Asociado señor Rivera García.**

En San Juan, Puerto Rico, a 30 de junio de 2023.

La colegiación compulsoria de los contadores públicos autorizados representa un eslabón imprescindible para la consecución del esquema regulatorio en su profesión. Un sistema fiscalizador, caracterizado por una consistente delegación de funciones por parte de las autoridades hacia la profesión y otras entidades interestatales.

Bien entendido, el saldo de este expediente revela una verdad inescapable: el ente público que en teoría debe regir a esta profesión, **la Junta de Contabilidad es, para todo efecto práctico, inexistente.** Al así serlo, resultaría incapaz de fiscalizar efectivamente a los profesionales de la contabilidad pública en un escenario en donde no existiera la colegiación compulsoria y el Colegio de Contadores Públicos Autorizados de Puerto Rico (CCPA) quedara inevitablemente despojado de su jurisdicción sobre los miembros no colegiados de esa profesión.

Como veremos a continuación, un análisis de las medidas vigentes en esta profesión demuestra que la Junta de Contabilidad: (1) no ofrece exámenes de reválida; (2) no procesa solicitudes de licenciamiento, renovación de licencia y licenciamiento por reciprocidad; (3) no administra un programa de revisión de pares (*peer review*); (4) no inspecciona las bitácoras de los contadores públicos autorizados y (5) no lleva a cabo acciones dirigidas a detener la práctica ilícita de esta profesión. Por el contrario, son otras entidades, especialmente el CCPA, quienes por propio mandato del Estado han sido llamadas a ejercer diversas funciones regulatorias.

En ese contexto, la colegiación compulsoria de los contadores públicos autorizados indisputadamente adelanta un interés apremiante en la seguridad y confiabilidad del tráfico financiero. Además, contribuye a los esfuerzos para que la contabilidad pública en Puerto Rico se mantenga firmemente afianzada en los estándares de calidad aplicables en todas las jurisdicciones estadounidenses.

Lamentablemente, los foros inferiores no ejecutaron el nivel de estudio sosegado que exigía este caso y le hicieron caso omiso a una multiplicidad de hechos pertinentes que debieron inclinar la balanza en una dirección opuesta. Por ello, estoy conforme en revocar al Tribunal de Apelaciones y desestimar la *Demanda* de epígrafe. Ausente una mayoría de los nueve miembros ideales de esta Curia, acatamos el mandato de nuestra Constitución.

**I**

Por estar los hechos recogidos en la *Opinión de Conformidad* de la Jueza Presidenta Oronoz Rodríguez, procedo a los fundamentos que informan mi criterio.

**A.** *Derecho a la no asociación y la colegiación compulsoria*

Es harto conocido que el derecho a la asociación surge expresamente de nuestra Carta Magna, disponiendo que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares".[1] Por ello, hemos reconocido que el derecho que emana de nuestra Constitución es distinto del derivado jurisprudencialmente de la Constitución Federal.[2]

De este modo, desde hace un tiempo este Tribunal reconoció que la libertad de asociación supone necesariamente el derecho a no asociarse.[3] Es en ese contexto que nos hemos enfrentado en los pasados años a una multiplicidad de controversias respecto a los requisitos de colegiación compulsoria. Entiéndase por ello, el requerimiento de que un profesional habilitado, como condición para el ejercicio lícito de su oficio, tenga que asociarse a un gremio compuesto por sus pares.

En esos menesteres, este Foro ha tenido dos oportunidades para expresarse sobre los requisitos que deben

---

[1] Const. P.R., Art. II, Sec. 6.
[2] *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 811 (2014).
[3] *Colegio de Abogados v. Schneider*, 112 DPR 540, 549 (1982).

exhibir las colegiaciones compulsorias para que sean constitucionalmente sostenibles. En primer lugar, en *Rivera Schatz v. ELA y Colegio de Abogados II*, supra, consideramos el requisito de colegiación compulsoria que se les había impuesto a los abogados en Puerto Rico.

Amparados exclusivamente en nuestro poder inherente para reglamentar la profesión legal, estimamos que la imposición de la colegiación compulsoria era innecesaria en nuestra jurisdicción.[4] Máxime, cuando la experiencia, al igual que **las herramientas que posee este Tribunal** para reglamentar la profesión legal, "son **suficientes y efectivas** para velar por el buen funcionamiento de la justicia en Puerto Rico".[5] (Negrillas suplidas).

No obstante, reconocimos que había un elemento adicional a esa controversia, vinculado directamente con el derecho a la no asociación.[6] En ese sentido, concluimos que cualquier interferencia sustancial con el derecho a no asociarse resulta constitucional solamente si el Estado (1) demuestra la existencia de un interés apremiante que la haga necesaria y (2) que no tenía a su alcance medidas menos onerosas para lograr el interés articulado.[7]

Posteriormente, en *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices*,[8] hicimos extensiva la

---

[4] *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 821.
[5] *Íb.*
[6] *Íb.*, pág. 809.
[7] *Íb.*, pág. 813.
[8] *Rodríguez Casillas et al v. Colegio*, 202 DPR 428 (2019).

discusión sobre el derecho a no asociarse a las restantes profesiones en nuestra Isla y reiteramos que cualquier actuación estatal que interfiriera con el derecho a la asociación debería sobrepasar un escrutinio estricto.

Según concluimos, en el contexto de los técnicos y mecánicos automotrices, aunque existía un interés apremiante del Estado, la colegiación compulsoria no era el medio menos oneroso.[9] Para ello, analizamos las disposiciones que crearon la Junta Examinadora de Técnicos y Mecánicos Automotrices y el Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico. Al compararlas, estimamos que sería mediante el buen ejercicio de las facultades delegadas a esa junta examinadora que se lograrían mantener estándares altos en esa profesión.[10]

De paso, en esa ocasión, el compañero Juez Asociado señor Estrella Martínez apuntaló, que era "necesario enfatizar que el esquema de colegiación compulsoria invalidado en este *caso particular* no necesariamente corresponde a la realidad de las profesiones restantes en Puerto Rico".[11] (Énfasis en el original). Concluyó, que regulación profesional **no puede tratarse homogéneamente**.[12]

En lo sucesivo, hemos tenido nuevas oportunidades para revisitar el tema de la colegiación compulsoria. No obstante, las decisiones en *Col. Vet. v. Veterinario Express*

---

[9] *Íb.*, pág. 452.
[10] *Íb.*
[11] *Íb.*, pág. 457. (Expresión concurrente, J. Estrella Martínez).
[12] *Íb.*

*et al*, 2022 TSPR 113, 210 DPR __ (2022); *Reyes Sorto et al v. CIAPR,* 2023 TSPR 62, 211 DPR __ (2023) y *Vélez Colón y otros v. Colegio de Optómetras de Puerto Rico*, 2023 TSPR 78, 211 DPR __ (2023), han dejado en manifiesto la pluralidad de criterios entre los miembros del Tribunal.

Ahora bien, tal y como lo hice en esas ocasiones, insisto en la necesidad de precisar las características que debe exhibir un método alterno a la colegiación compulsoria, para que pueda decretarse la inconstitucionalidad de esta última. Por ello, reafirmo mi criterio de que la determinación sobre si efectivamente existe un medio menos oneroso requiere, responsablemente, determinar que esa alternativa sea **viable y efectiva**.

En aras de ello, recurro a la jurisprudencia de la Corte Suprema Federal, persuasiva en esta materia, que nos ilustra sobre como ese Foro ha atendido el concepto del alegado medio menos oneroso y su viabilidad.[13] Mediante esta casuística, veremos que **la consideración de la viabilidad de las alternativas propuestas no es un asunto ajeno al análisis de escrutinio estricto**. Veamos a continuación.

En *U.S. v. Playboy Entertainment Group, Inc.*,[14] en un contexto de libertad de expresión, el Máximo Foro Federal expresó que cuando una alternativa plausible y menos restrictiva es ofrecida, es el deber del Estado demostrar

---

[14] *U.S. v. Playboy Entertainment Group, Inc.*, 529 US 803 (2000).

que esa alternativa sería **inefectiva** para lograr el fin gubernamental.[15] De este modo, recaía en el Gobierno Federal la tarea de demostrar que **la alternativa propuesta sería inefectiva** y que, por ende, el mecanismo existente era el medio menos oneroso.[16]

Posteriormente, en *Ashcroft v. ACLU*,[17] nuevamente un caso de libertad de expresión, se expuso que la tarea de un tribunal es cuestionarse **si la medida impugnada es el medio menos oneroso dentro de las alternativas <u>disponibles y efectivas</u>**.[18] Dado que el Estado tiene el peso de la prueba a la hora de defender la constitucionalidad de la medida, los litigantes impugnadores deberían prevalecer **a menos que el gobierno demostrara que la medida propuesta es menos efectiva que la existente**.[19]

Finalmente, en *Burwell v. Hobby Lobby Stores, Inc.*,[20] un caso sobre una restricción a la libertad religiosa, al considerar una alternativa a un requerimiento gubernamental bajo el escrutinio estricto, la Corte Suprema Federal apuntaló que el Estado no había demostrado que esa alternativa **no fuera viable**.[21]

---

[15] *Íb*., pág. 816.
[16] *Íb*., pág. 823. ("It was for the Government, presented with a plausible, less restrictive alternative, **to prove the alternative to be ineffective**, and § 505 to be the least restrictive available means.") (Negrillas suplidas).
[17] *Ashcroft v. ACLU*, 542 US 656 (2004).
[18] *Íb*., pág. 666. ("Instead, the court should ask whether the challenged regulation is the least restrictive means among **available, effective alternatives**.") (Negrillas suplidas).
[19] *Íb*.
[20] *Burwell v. Hobby Lobby Stores, Inc.*, 573 US 682 (2014).
[21] *Íb*., pág. 728.

**B.** *La Ley de Contabilidad de 1945*

El estatuto rector de la contabilidad pública en Puerto Rico es la Ley de Contabilidad Pública de 1945.[22] En virtud de esta ley se creó la Junta de Contabilidad, la cual **debe estar compuesta por cinco miembros.**[23] De entrada, se establecen los requisitos que debe reunir una persona que interese se expida a su nombre o el de su firma la licencia de contador público autorizado. Entre estos, la Sec. 3 del estatuto dispone que debe ser una persona que haya "aprobado el Examen Uniforme de Contador Público Autorizado **administrado por la Junta".**[24]

La Ley de Contabilidad Pública también regula el procedimiento mediante el cual un contador, que no tenga una licencia expedida al amparo de esa ley, pueda obtener los privilegios de los contadores públicos autorizados en Puerto Rico.[25] Esto requiere, entre otras cosas, que el estado o jurisdicción en el cual tenga su licencia mantenga reciprocidad con Puerto Rico y que la jurisdicción haya sido calificada como sustancialmente equivalente por el *National Qualification Appraisal Service* de la *National Association of State Boards of Accountancy* (NASBA).[26]

Ahora bien, la Junta de Contabilidad expide las licencias aplicables a los contadores públicos, las cuales

---

[22] Ley Núm. 293 de 15 de mayo de 1945, 20 LPRA sec. 771 *et seq.*
[23] 20 LPRA sec. 773.
[24] 20 LPRA sec. 774.
[25] 20 LPRA sec. 775
[26] *Íb.*

tendrán una vigencia de tres años. Posteriormente, toda solicitud para renovar la licencia deberá ser acompañada con la evidencia de cumplimiento con los créditos de educación continua. Además, la ley dispone que "[l]a **Junta aceptará las certificaciones que sostenidas por la debida evidencia emita el Colegio de Contadores Públicos Autorizados a los efectos del cumplimiento de los colegiados con los requisitos de educación continuada que establece esta ley**".[27]

No obstante, no podemos soslayar la realidad del funcionamiento del proceso para administrar exámenes y expedir o renovar licencias. Y es que **la Junta de Contabilidad ha delegado la actividad de preparar y administrar la reválida** para la licencia de contador público autorizado **a la NASBA,** una asociación interestatal de juntas de contabilidad.[28] Es la NASBA quien determina la procedencia de las solicitudes para tomar el examen, al igual que sobre las materias y parámetros que comprenden el *Uniform CPA Examination*.[29] Además, **la Junta de Contabilidad ha designado a la NASBA para que ofrezca los servicios de licenciamiento de contadores públicos autorizados, incluyendo las renovaciones y las licencias por reciprocidad.**[30]

---

[27] 20 LPRA sec. 779.

[28] Contadores Públicos Autorizados, Departamento de Estado, https://www.estado.pr.gov/juntas-examinadoras/contadores-publicos-autorizados. (Ultima visita 19 de mayo de 2023).

[29] Puerto Rico, National Association of State Boards of Accountancy, https://nasba.org/exams/cpaexam/puertorico/. (Ultima visita 19 de mayo de 2023).

[30] Puerto Rico, National Association of State Boards of Accountancy, https://nasba.org/licensure/nasbalicensing/puerto-rico-2/. (Ultima visita 19 de mayo de 2023).

Por otro lado, la Junta de Contabilidad queda investida, además, con la autoridad legal para revocar o suspender cualquier certificado expedido al amparo de la Sec. 3 de la ley.[31] A esos fines la Sec. 9 establece el procedimiento para llevar a cabo un encausamiento contra un tenedor de un certificado expedido por la Junta.[32] En sintonía con lo anterior, la Junta de Contabilidad promulgó su vigente Reglamento de Ética Profesional para los Contadores Públicos Autorizados de Puerto Rico.[33]

Surge de este cuerpo reglamentario que **la Junta de Contabilidad adoptó íntegramente las disposiciones del Código de Conducta Profesional del Instituto Americano de Contadores Públicos Autorizados** (AICPA por sus siglas en inglés).[34] Más aun, se dispuso que las enmiendas prospectivas a ese código **se entienden adoptadas** a menos que la Junta de Contabilidad exprese lo contrario.[35] A renglón seguido, el reglamento reconoce el rol de la Junta de Contabilidad y del CCPA respecto a las querellas sobre conducta profesional. De suma importancia, se expresa que

> [l]a Junta de Contabilidad y el Colegio de CPA **laboran en coordinación la atención de las querellas de conducta profesional** que advienen a su atención para lograr su estudio y conclusión en el plazo de tiempo más corto permitido por la Ley. De esta forma, se logra el propósito fundamental de mantener el alto desempeño de la

---

[31] 20 LPRA sec. 780.
[32] 20 LPRA sec. 782.
[33] Reglamento de Ética Profesional para los Contadores Públicos Autorizados de Puerto Rico, Reglamento Núm. 8383 de 14 de agosto de 2013, Departamento de Estado.
[34] *Íb.*, págs 4-5.
[35] *Íb.*, pág. 5.

profesión de Contabilidad Pública en Puerto Rico.[36] (Negrillas suplidas).[37]

C.   *Ley del Colegio de Contadores Públicos Autorizados de Puerto Rico*

Por su parte, el CCPA fue creado por nuestra Asamblea Legislativa,[38] para que las personas autorizadas a ejercer la profesión de contador público autorizado en Puerto Rico pudiesen organizarse como entidad jurídica cuasi-pública.[39] Para ello, le otorga al CCPA las facultades que ordinariamente se le reconocen en nuestro ordenamiento a las entidades jurídicas.[40] Por otro lado, le asigna ciertos deberes aspiracionales como parte de su gesta.[41]

No obstante, destaco, que el CCPA viene llamado a **"velar por el cumplimiento de los cánones de ética profesional** que para regir la conducta de los Contadores Públicos Autorizados haya adoptado o en el futuro adopte la Junta de Contabilidad de Puerto Rico".[42] (Negrillas suplidas). De otra parte, en cuanto al procesamiento de aquellos profesionales que se aparten de esos postulados éticos, la ley le reconoce autoridad al CCPA para

> recibir e investigar las querellas que se formulen respecto a la práctica y/o conducta de los miembros en el ejercicio de la profesión; celebrar vistas en las que se dará oportunidad al miembro afectado o a su representante de someter hojas de trabajo u otra

---

[36] *Íb.*, pág. 6.
[37] *Íb.*
[38] Ley del Colegio de Contadores Públicos Autorizados de Puerto Rico, Ley Núm. 75 de 31 de mayo de 1975, según enmendada, 20 LPRA sec. 793 *et seq.*
[39] 20 LPRA sec. 793
[40] 20 LPRA sec. 794.
[41] 20 LPRA sec. 805.
[42] 20 LPRA sec. 794.

> evidencia pertinente; llevar querellas ante la Junta
> de Contabilidad para la acción correspondiente.[43]

La Ley del CCPA, además, consigna expresamente el requisito que ha motivado el pleito de epígrafe. Y es que el Art. 3 dispone que la "Junta de Contabilidad no expedirá o renovará licencia para ejercer la profesión de Contador Público Autorizado a ninguna persona que no sea miembro del Colegio".[44] De este modo, se establece estatutariamente el requisito de colegiación compulsoria en esta profesión. De paso, la ley priva al CCPA de cualquier tipo de discreción sobre a quién puede aceptar como miembro. Por el contrario, el CCPA "**tendrá que aceptar como miembro** a cualquier persona a quien la Junta de Contabilidad le haya expedido o esté en proceso de expedir el certificado de Contador Público Autorizado".[45] (Negrillas suplidas).

Ahora bien, la ley también reconoce la autoridad que tiene el CCPA para adoptar y expedir un sello acreditativo por un valor no mayor de cinco dólares ($5.00).[46] Ningún contador público autorizado podrá emitir una opinión, informe o certificación sin haber adherido dicho sello.[47] La importancia de este sello queda en manifiesto, pues el estatuto reconoce "que ningún departamento del gobierno, tribunal o entidad cuasi pública del Estado Libre Asociado

---

[43] *Íb*. Lo anterior, ciertamente, bajo el presupuesto de que la Junta de Contabilidad tiene su propia autoridad legal para llevar a cabo encausamientos similares.

[44] 20 LPRA sec. 795.

[45] *Íb*.

[46] 20 LPRA sec. 802.

[47] *Íb*.

de Puerto Rico aceptará documentos con opiniones, informes o certificaciones que no tengan un sello adherido".[48]

Por otra parte, y en lo extremo pertinente, la Ley del CCPA establece en su Art. 11A la obligación de todos los contadores públicos de remitir al CCPA un Índice de Bitácora informando sus opiniones, informes o certificaciones emitidas hasta la fecha en la que se radique.[49] Indica la ley que en el Índice de Bitácora se hará constar la siguiente información:

> (a) el número de la estampilla correspondiente al informe,
>
> (b) si el informe fue emitido a persona natural o jurídica, y en el caso de la última el tipo de persona jurídica, y
>
> (c) la fecha y descripción del informe.[50]

En esta faena, **el CCPA fue investido estatuariamente con la autoridad para recibir, mantener y supervisar los Índices de Bitácoras**.[51] Tan es así, que la ley faculta al CCPA para que pueda fijar una cuota adicional para sufragar los gastos que involucra este proceso.[52]

Como parte de su cumplimiento con la labor de inspeccionar el Índice de Bitácora, el CCPA ha desarrollado un Procedimiento para Examinar la Compra, Uso y Registro del

---

[48] *Íb.*

[49] 20 LPRA sec. 803a. En caso de no haber emitido certificaciones u opiniones durante el año, el profesional solo rendirá un informe negativo.

[50] *Íb.*

[51] *Íb.*

[52] *Íb.*

Sello Acreditativo Numerado del Colegio.[53] Este procedimiento resulta altamente ilustrador sobre lo que involucra, en términos prácticos, supervisar los Índices de Bitácoras.

De entrada, si bien el colegiado deberá rendir el informe al CCPA, este tiene el deber de recibir a un funcionario autorizado en su oficina u otro lugar acordado para la revisión correspondiente.[54] Como parte de este examen, el funcionario ejecuta una serie de labores respecto a la corrección de la información que surge en el informe. Crucialmente, el funcionario "**examinará el informe completo, para asegurarse que la redacción del mismo sea adecuada.** Solamente en los casos de trabajos de revisión y auditoría se verificará la existencia de las hojas de trabajo que respalda el del CPA en el cual se usó la estampilla".[55] Como resultado de esta supervisión, el funcionario del CCPA prepara un informe que, de incluir potenciales violaciones al Procedimiento Uniforme, será sometido al Comité de Conducta Profesional.[56]

### D. Sentencia Sumaria

Es harto conocido que nuestro ordenamiento procesal civil reconoce el uso y valor del mecanismo de la sentencia sumaria como vehículo para asegurar la solución justa,

---

[53] Procedimiento para Examinar la Compra, Uso y Registro del Sello Acreditativo Numerado del Colegio, Colegio de Contadores Públicos Autorizados de Puerto Rico, 28 de septiembre de 2019.
[54] *Íb.*, pág. 2.
[55] *Íb.*, pág. 6.
[56] *Íb.*

rápida y económica de un caso.[57] Tal herramienta posibilita la pronta resolución de una controversia cuando no se requiera la celebración de un juicio en su fondo. Ahora bien, para que proceda este mecanismo es necesario que de los documentos no controvertidos surja que no hay un controversia real y sustancial sobre los hechos del caso.[58] Puesto de otra manera, que solo resta aplicar el derecho.[59] Según hemos expresado, un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable".[60] Para que exista una controversia sobre los hechos, esta debe ser real, es decir, cualquier duda es insuficiente para derrotar una moción de sentencia sumaria.[61]

Por su parte, la Regla 36 de Procedimiento Civil,[62] que regula el mecanismo de la sentencia sumaria, exige ciertos requisitos de forma para la moción que se inste y su respectiva oposición. Así, la parte que sostenga que "la inexistencia de una controversia sustancial de hechos esenciales y pertinentes" debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible.[63]

Además, tanto la moción como su oposición deben presentar

---

[57] Véanse, *Meléndez González v. M. Cuebas*, 193 DPR 100 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414 (2013); *Ramos Pérez v. Univisión*, 178 DPR 200 (2010).

[58] *Ramos Pérez v. Univisión*, supra, pág. 214.

[59] *Íb.*

[60] *Meléndez González v. M. Cuebas*, supra, pág. 110; *Ramos Pérez v. Univisión*, supra, pág. 213.

[61] *Ramos Pérez v. Univisión*, supra, págs. 213-14.

[62] 32 LPRA Ap. V, R. 36.1.

[63] *Íb.*

una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal.[64]

Finalmente, si el cúmulo de la evidencia anejada demuestra que no hay controversia sustancial en cuanto algún hecho esencial y pertinente, el tribunal deberá dictar sentencia sumaria si procede como cuestión de derecho.[65] Por ende, el tribunal no deberá dictar sentencia sumaria si: (1) existen hechos esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge una controversia real sobre algún hecho esencial o material de los propios documentos que acompañan la moción, o (4) no procede como cuestión de derecho.[66]

## II

De entrada, como advertí en *Reyes Sorto et al v. CIAPR*, supra, existe un malentendido procesal que precisa disipar en estos pleitos. Como vimos, el mecanismo de la sentencia sumaria permite a un tribunal emitir una determinación en los méritos si la prueba documental demuestra una ausencia de controversias sobre hechos materiales. De este modo, un tribunal se encuentra en posición de resolver sumariamente

---

[64] 32 LPRA Ap. V, R. 36.3.
[65] *Íb*.
[66] *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 595. (2013).

cuando las alegaciones y la prueba sometida por las partes no demuestra controversia real sobre los hechos pertinentes.

El problema, es que, en casos de esta naturaleza, existe una tendencia a simplificar la controversia e ignorar hechos que apuntan hacia la inviabilidad del modelo alterno propuesto. Me refiero, pues, a la resistencia de los foros inferiores a tomar en consideración aquellos factores que enriquecen el análisis sobre la existencia del medio menos oneroso y que exigen que este sea encontrado únicamente cuando se demuestre su viabilidad. Entre estos, factores presupuestarios, organizacionales, estatutarios y otros.

Cuando esos factores apuntan hacia una seria duda sobre si una junta examinadora, sin más, resulta habilitada para regular una profesión, sostengo que no es posible decretar la inconstitucionalidad de un requisito de colegiación compulsoria. Más bien, procede sostener el *status quo* ante la patente insuficiencia de los argumentos en su contra.

Adviértase, como anticipé en *Col. Vet. v. Veterinario Express et al*, supra, que el análisis de viabilidad se satisface con mayor facilidad en aquellos casos en los cuales la junta examinadora, *a priori*, ya ejerce todas y cada una de las facultades necesarias para asegurar los mayores estándares en una profesión. En ese escenario, la colegiación compulsoria se torna indefendible pues resulta redundante dentro del esquema regulatorio. **Este no es uno de esos casos.**

El extenso expediente de este pleito demuestra que la contabilidad pública, por décadas, ha sido regulada y supervisada mediante una serie de mecanismos que, **en conjunto**, aseguran la excelencia profesional. Al presente, ausente una alternativa viable a ese esquema, que adelante igualmente los intereses estatales y sea menos onerosa al derecho a no asociarse, procede el sostenimiento íntegro del mismo. Me explico.

## III

Ciertamente, procede someter la medida de colegiación compulsoria aquí cuestionada a los rigores del escrutinio estricto. Al así hacerlo, mantengo mi postura afianzada en los precedentes de *Rivera Schatz II v. Colegio de Abogados*, supra, y *Rodríguez Casillas v. Colegio de Técnicos y Mecanicos Automotrices*, supra. Rechazo totalmente que una determinación revocatoria en este pleito tendría el efecto de desterrar esos precedentes.

Como he insistido incansablemente, esas opiniones solo exigen una metodología particular, no un resultado. Además, no hay doctrina jurisprudencial que no pueda ser objeto de mejoramiento, si así lo amerita. Darle sentido a lo que implica la existencia de un medio menos oneroso no hace otra cosa que solidificar la determinación judicial.

Dicho esto, como de costumbre, el estudio en estos casos debe comenzar con un examen detallado de las disposiciones legales aplicables a esta profesión. Esto,

ordinariamente, supone escudriñar los estatutos rectores de la junta examinadora y del colegio profesional. Posteriormente, se recurre a los factores prácticos que nos informan sobre la realidad de ese oficio.

Como vimos, en teoría, la Junta de Contabilidad viene llamada a ejecutar una variedad de actividades regulatorias, entre ellas: (1) administrar exámenes de reválida, (2) expedir, renovar o revocar licencias; (3) celebrar procedimientos de encausamiento ético y (4) detener la práctica ilícita de la profesión. En la práctica, **no hace ninguna de ellas.**

Aquí, la Junta de Contabilidad ha tomado una decisión indisputable de ceder prácticamente todas sus funciones a la NASBA o al CCPA. De paso, según nos informa el Estado, al presente esta junta **solo tiene dos de sus cinco miembros** ideales.[67] Por lo cual, **ni aun queriendo**, pudiese supervisar efectivamente a su profesión.

Según examinado, es la NASBA, una entidad interestatal, quien administra el *Uniform CPA Examination* y a quien **la Junta de Contabilidad le delegó toda actividad relacionada a la otorgación de certificados de licencia.** Respecto a ello, la Junta de Contabilidad no hace otra cosa que indicarle, a quien desee someterse a uno de esos procedimientos, que debe recurrir a la NASBA.

---

[67] *Alegato del Estado*, pág. 9.

Por otra parte, según apuntaló el CCPA en sus diversos escritos, la función de defender la profesión, bien sea mediante procesamientos éticos o a través de recursos en los tribunales para detener la práctica ilícita de la contabilidad pública, **la cumple prácticamente sola el CCPA**. Además, la propia Junta de Contabilidad reconoció mediante reglamento que la resolución de las querellas sobre conducta profesional supone una coordinación con el CCPA.[68]

Hasta ahí, en lo atinente al CCPA, solo estamos hablando de funciones delegadas y compartidas. No obstante, restan todavía aquellas funciones propias del gremio. Entiéndase, todo lo relacionado al Índice de Bitácoras. En cuanto a esto, no pasamos por alto que los apelados han hecho un esfuerzo a través de sus argumentos escritos y verbales para restarle importancia a este proceso. Además, han sugerido que, ausente la colegiación compulsoria, como quiera se podría seguir exigiendo la supervisión del CCPA sobre los expedientes de los contadores no miembros. Contesto estas aseveraciones en turno.

Primeramente, salta a la vista la similitud entre la inspección del Índice de Bitácoras y la revisión que la Oficina de Inspección de Notarías (ODIN) ejecuta respecto a la obra de los notarios. Además, surge que la inspección del Índice de Bitácoras conlleva un inevitable acceso a la

---

[68] Reglamento de Ética Profesional para los Contadores Públicos Autorizados de Puerto Rico, *supra*, pág. 6

información que obra en el expediente del CPA. La sensibilidad de ello no se subestima.

A lo largo de este pleito el CCPA ha insistido en un argumento novel y persuasivo sobre el peligro que tendría para la confidencialidad de la información de los clientes de sus miembros el que la función de inspeccionar las bitácoras pase a un ente estatal. Esto, ante la posibilidad de que la información advenga en manos del Estado sin observarse los requisitos de rigor. Ateniéndome a lo que es pertinente a este pleito, me limito a indicar que el argumento del CCPA, como mínimo, no es frívolo.

Este Tribunal ha considerado previamente la importancia de la relación contador-cliente.[69] Ello, por la sensibilidad de la información que en confianza el cliente le provee al contador. Tan es así, que nuestro ordenamiento probatorio reconoce el privilegio contador público autorizado-cliente, que impera ausente las circunstancias particulares descritas en ley.[70] De ahí, que el argumento sobre el riesgo de que la información confidencial llegue a manos del Estado, sin mediar la autorización correspondiente, resulta enteramente plausible.

Por ello, reafirmo la importancia del proceso de inspección de bitácoras. De paso, un proceso para el cual el CCPA pudiese cobrar una cuota separada, pero opta por no

---

[69] Véase, *McNeill Healthcare, LLC v. Mun. de Las Piedras*, 206 DPR 391 (2021).
[70] Véase, Regla 504 de Evidencia, 32A LPRA Ap. VI.

hacerlo al englobarlo con la cuota anual. En cuanto a esto, algunos compañeros en la vista oral expresaron que pudiese ser posible que el CCPA cobrara esa cuota a personas que no fueran miembros y de esa manera se salvaguardara esa función delegada. No estoy de acuerdo.

Y es que, en segundo lugar, continúa proliferándose una noción a los efectos de que un gremio, **al cual se le privó de una colegiación compulsoria**, pudiese continuar ejerciendo su autoridad estatutaria sobre profesionales no miembros. Discrepo totalmente de este razonamiento.

Las leyes que establecen colegios profesionales y colegiaciones compulsorias fueron ideadas bajo el presupuesto de que todos los miembros de la profesión serían miembros obligatorios del gremio y, por ende, sujetos a su jurisdicción. No podría ser de otra manera, al menos bajo la legislación actual. Incluso, la redacción del Art. 11A de la Ley del CCPA, *supra*, que hace referencia a contadores públicos autorizados y no a colegiados, solo podría sostenerse bajo el entendido que sugiero.

De este modo, reitero mi postura de que la consideración de opciones en estos casos se limita exclusivamente las que están sobre la mesa. Entiéndase, el medio existente y el que propongan los impugnadores. No nos compete el escabroso proceso de especular sobre otras posibles iteraciones de los estatutos que examinamos en estos casos. Las leyes existentes son claras en su

formulación y propósito. La consideración de alternativas o modificaciones adicionales constituye una función propia de la Asamblea Legislativa, en el sano uso de sus poderes constitucionales.

Así las cosas, resulta evidente que bajo este esquema regulatorio la Junta de Contabilidad no es viable como único regulador y que las funciones que el CCPA ostenta cumplen su cometido precisamente en virtud de la jurisdicción sobre sus miembros que le ofrece la colegiación compulsoria. A la luz del escrutinio estricto, ¿qué nos sugiere esto?

En primer lugar, no hubo dificultad, ni siquiera en la vista argumentativa, de encontrar un interés apremiante del Estado. Si bien articulado en distintas maneras por las partes, todas coinciden en que la regulación efectiva de la contabilidad pública, por su trascendencia como profesión, constituye un interés apremiante.

En segundo lugar, no existen serias dudas de que la colegiación compulsoria, como medida regulatoria, adelanta ese interés primordial. De ahí el imperativo de conocer si esa medida gubernamental era la menos onerosa que el Estado tuviera a su disposición, **dentro de aquellas que fueran viables.** La única opción que los apelados traen es la de eliminar el requisito de colegiación compulsoria y presumir que la Junta de Contabilidad, en un mundo ideal, pudiese ser capaz de regular esta profesion. No me convencen.

Ante un ente gubernamental que ha tenido como práctica, precisamente, no hacer prácticamente nada, no podemos echar a la suerte la excelencia profesional en la contabilidad pública. Aquí, la ausencia de opciones reales a la colegiación compulsoria exige la retención del modelo actual. Por ser este el curso decisorio que el Tribunal adopta por mandato constitucional, estoy conforme.


                                    Edgardo Rivera García
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Félix Norman Román Negrón y
otro

      Apelados

        v.                      AC-2022-0026

Colegio de Contadores
Públicos Autorizados y otros

      Apelantes


Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES a la que se unieron la Jueza Asociada señora PABÓN CHARNECO, el Juez Asociado señor KOLTHOFF CARABALLO y el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 30 de junio de 2023.

Obligar a una persona a asociarse con quien no desea como condición para ejercer su profesión, *so pena* de incurrir en un delito menos grave, no puede ser un ejercicio de poder legislativo avalado livianamente por los tribunales. Por el contrario, este Tribunal Supremo tiene el indelegable deber de escrutar esta intromisión estatal con el más alto rigor.

Desafortunadamente, por estar igualmente divida, esta Curia perdió la oportunidad de pautar sin atisbo de duda que la colegiación compulsoria de los contadores públicos autorizados (CPA) es inconstitucional. A consecuencia de este *impasse*, un grupo de profesionales continúa sujeto a un requisito

de asociación compulsoria que no se ajusta al mandato constitucional de nuestra Carta de Derechos. En este caso, si bien el Estado tiene un interés apremiante en regular la práctica de la contabilidad pública autorizada, no se demostró que la colegiación compulsoria es imprescindible para lograrlo.

No obstante, algunos integrantes de este Tribunal insisten en disponer de una controversia sobre derechos fundamentales mediante la aplicación de una metodología que se aparta del escrutinio estricto. De ese modo, concluyen que la colegiación compulsoria de los CPA es necesaria porque, aunque existen alternativas menos restrictivas, estas "no funcionan" para adelantar los objetivos del Estado. Fundamentan su pensar en el entendimiento de que la Junta de Contabilidad actualmente no desempeña y ha delegado la mayoría de las funciones para las que fue habilitada. Bajo su errada teoría, bastaría con que el Estado decida no realizar sus funciones o las delegue para que se justifique su intromisión con derechos fundamentales.

Advierto que bajo ese raciocinio el Estado no tendría que realizar esfuerzos o reajustes para evitar interferir con derechos constitucionales. Entonces, si es el propio ente gubernamental quien, por acción o inacción, promueve que un medio menos intrusivo no funcione, ¿premiaremos su proceder? ¿Qué sucederá cuando el Estado, so pretexto de que las alternativas para no lesionar un derecho "no funcionan" —por culpa suya—, intente menoscabar otros

derechos fundamentales?  No puedo avalar un retroceso de esa magnitud en nuestra doctrina constitucional.

I

La controversia ante nos se originó mediante la presentación de una demanda por parte de Félix Norman Román y Virgilio Vega III contra el Estado y el Colegio de CPA. Allí, alegaron que el requisito de colegiación compulsoria para poder practicar su profesión lesionaba su derecho a la libertad de asociación.

El Colegio contestó la demanda y sostuvo que la colegiación compulsoria respondía al interés apremiante del Estado de mantener altos estándares en la profesión de la contabilidad pública y proteger el derecho a la intimidad de terceros. Añadió que la Asamblea Legislativa le concedió un rol activo en la regulación de la profesión y que el esquema regulatorio actual requiere la coexistencia de la Junta de Contabilidad y el Colegio. Además, señaló que la Junta carece de los fondos y recursos humanos para descargar efectivamente las funciones que realiza el Colegio, que son sufragadas exclusivamente con las cuotas de los miembros.

Posteriormente, el Estado presentó una moción de sentencia sumaria en la cual solicitó que el tribunal dictara el remedio que en derecho procediera. Argumentó que, al amparo del precedente de este Tribunal en _Rodríguez Casillas et al._ v. _Colegio_, _infra_, toda disposición estatutaria que imponga un requisito de membresía a

cualquier entidad para el ejercicio de una profesión regulada por una junta examinadora es inconstitucional.

Por otro lado, el Colegio se opuso a la solicitud de sentencia sumaria. Aseveró que la colegiación compulsoria de los CPA era necesaria para preservar el derecho a la intimidad de terceros. Particularmente, señaló que era indispensable mantener los documentos de trabajo de los CPA fuera de las manos del Estado, porque estos contienen información confidencial de los clientes. Adujo que el acceso de la Junta de Contabilidad a esa información equivaldría a un registro irrazonable. Unas semanas después, el Colegio compareció nuevamente y solicitó que se tomara conocimiento judicial de que el Departamento de Justicia, en otros casos que versaban sobre la colegiación de los médicos y los dentistas, presentó mociones de sentencia sumaria en las que solicitó que se validara la colegiación compulsoria de estos profesionales, aun cuando en ambas profesiones existen juntas examinadoras. Añadió que en esos casos, el Departamento de Justicia defendió la colegiación compulsoria bajo el fundamento de que la libertad de asociación debía ceder ante derechos constitucionales de mayor jerarquía como el derecho a la intimidad.

Tras evaluar las posturas de las partes, el Tribunal de Primera Instancia concedió la sentencia sumaria solicitada por el Estado y declaró inconstitucional la colegiación compulsoria de los CPA. Resolvió que el Colegio

no logró establecer cuál es el interés apremiante que justifica la violación del derecho a la libertad de asociación. En cuanto al argumento sobre el derecho a la intimidad de terceros, concluyó que el deber de custodiar los documentos confidenciales no depende de la colegiación compulsoria, pues se trata de una obligación estatutaria de los CPA. Además, enfatizó que la incapacidad presupuestaria no puede constituir una justificación para violar el derecho a la libertad de asociación.

El Colegio solicitó reconsideración de la sentencia y propuso que se incorporaran hechos incontrovertidos adicionales. Entre los hechos propuestos, reiteró que la Junta no posee los recursos para operar adecuadamente. Además, abundó sobre el proceso de emisión de estampillas y revisión de calidad. No obstante, la solicitud de reconsideración fue denegada.

Inconforme, el Colegio recurrió al Tribunal de Apelaciones. Alegó que el foro primario no realizó un análisis individualizado de las circunstancias particulares de la colegiación compulsoria de los CPA, que a su entender lo distinguen de nuestros precedentes sobre el tema. A modo de ejemplo, el Colegio reiteró que la facultad de revisión de calidad que le fue delegada no se le podía transferir a la Junta de Contabilidad sin incidir sobre el derecho a la intimidad de los clientes de este gremio. Asimismo, aseveró que la eliminación de la colegiación compulsoria afectaría

el sistema de reciprocidad de licencias y validez extra jurisdiccional de las opiniones de los CPA.

Sucesivamente, en su alegato ante el foro intermedio, el Estado cambió de postura. Al hacerlo, expresó de forma parca que la colegiación compulsoria de los CPA **podría** superar el crisol constitucional si se tomaba en consideración que existen obligaciones delegadas exclusivamente al Colegio que no pueden ser transferidas a la Junta sin incidir sobre el derecho a la intimidad de terceros. Además, acogió el argumento del Colegio de que eliminar la colegiación compulsoria trastocaría la reciprocidad y la validez de las licencias y certificaciones.

Por su parte, los CPA apelados alegaron que el foro primario actuó correctamente al decretar la inconstitucionalidad de la colegiación compulsoria de los miembros de esta profesión. Arguyeron que ni el Estado ni las leyes que regulan la práctica de la contabilidad pública esgrimen un interés apremiante para lesionar el derecho a la libertad de asociación. A su vez, precisaron que en este caso existe una Junta de Contabilidad que es una medida menos onerosa para proteger cualquier interés del Gobierno. Argumentaron que era absurdo aseverar que una legislación que le permite dar información confidencial de terceros a un ente privado no vulnera el derecho a la intimidad, pero si se le permite a un ente gubernamental sí lo vulnera. Respecto al argumento del Colegio sobre la posible pérdida

de la reciprocidad de licencias, afirmaron que la colegiación compulsoria no tiene paralelos en otras jurisdicciones que participan del mecanismo de reciprocidad. Del mismo modo, enunciaron que la falta de fondos públicos no puede justificar la lesión de un derecho constitucional. Finalmente, indicaron que bajo una colegiación voluntaria el Colegio podría seguir colaborando sin obligar a los CPA a pertenecer a la asociación.

El Colegio presentó una breve réplica al alegato de los apelados. En el escrito intentó aclarar que en ningún momento había argumentado que se debía mantener la colegiación compulsoria debido a la falta de recursos del Estado. Arguyó que su posición era que la delegación de ciertas facultades reguladores por parte la Asamblea Legislativa, así como la imposición de una cuota para financiar las funciones que le fueron delegadas, era completamente legal. Resaltó que la Junta de Contabilidad estaba autorizada a solicitar apoyo de otras organizaciones para la implantación de los reglamentos que esta promulga. A modo ilustrativo, el Colegio aseveró que la Junta de Contabilidad le delegó a la *National Association of State Board of Accountancy* (NASBA) la administración del examen de reválida y el proceso administrativo de licenciamiento y renovación de los CPA. Explicó que la NASBA cobra por sus servicios a cada solicitante. Por otra parte, expuso que el método mundialmente reconocido para garantizar la confiabilidad de la obra de los CPA era el *peer review* y

que en todos los casos que habían examinado, dicho programa le ha sido delegado por parte de las agencias reguladoras a entidades privadas análogas al Colegio, a quienes se paga una cuota por el servicio.

Examinados los planteamientos de las partes, el foro apelativo intermedio confirmó la inconstitucionalidad de la colegiación compulsoria de los CPA. Concluyó que el Estado tiene un interés apremiante en regular la profesión de la contabilidad pública y preservar la confidencialidad de la información que estos profesionales manejan. No obstante, resolvió que la Junta de Contabilidad y la colegiación voluntaria eran medios menos onerosos para lograr la consecución de ese interés.

Nuevamente inconforme, el Colegio presentó una apelación ante este Tribunal en la que solicitó que revocáramos la determinación de inconstitucionalidad confirmada por el Tribunal de Apelaciones. En esencia, reiteró los mismos planteamientos presentados en los foros inferiores. A saber, que en este caso no se realizó un análisis individualizado de sus facultades particulares. Asimismo, se opuso a que se exima a los CPA del pago de una cuota para financiar la reglamentación de la profesión de la contabilidad pública.

Mas adelante, en su alegato el Estado se limitó a resumir las posturas de las partes y sin asumir una posición concreta, expresó que la colegiación compulsoria de los CPA podría superar el crisol constitucional. En contraste,

durante la vista oral celebrada ante este Tribunal, argumentó por primera vez que la colegiación compulsoria aquí impugnada era constitucional ya que la Junta de Contabilidad no es un mecanismo viable y efectivo para regular la profesión. En específico, dijo que la Junta Examinadora no tiene la capacidad económica ni el personal para cumplir con sus facultades estatutarias ni asumir las funciones que hoy realiza el Colegio.

Por su parte, los CPA apelados reiteraron su posición sobre la inconstitucionalidad de la colegiación compulsoria. Afirmaron que existen mecanismos menos restrictivos para adelantar los intereses del Estado. Por ejemplo, destacaron que la Junta de Contabilidad cuenta con facultades investigativas, fiscalizadoras, disciplinarias y de licenciatura con relación a estos profesionales. Recalcaron que la no asignación de fondos públicos no puede ser fundamento para permitir la vulneración de derechos fundamentales. En apoyo, expusieron que bajo esa razón el Estado podría, entre otras cosas, incautar propiedad sin justa compensación, no darle comida a los confinados si no cuenta con los recursos económicos ni pedir una orden de allanamiento para un registro, si no dispone del personal para ello. A su vez, arguyeron que en ninguna jurisdicción de Estados Unidos se obliga a los CPA a ser miembros de una asociación para regular la profesión. Sobre ese punto, añadieron que en esas otras jurisdicciones existen entidades privadas que coordinan los programas de revisión

de calidad y *peer review*, sin que se obligue a los CPA a afiliarse a ellas. En apoyo, explicaron que el Instituto Americano de Contadores Públicos Autorizados (AICPA) es la entidad privada responsable de administrar el programa de *peer review* y su membresía es voluntaria. Asimismo, puntualizaron que el Colegio de Abogados y el Colegio de Mecánicos continúan operando y aportando al mejoramiento de sus respectivas profesiones luego de se declarara la inconstitucionalidad de los requisitos de afiliación compulsoria a dichas asociaciones. Finalmente, expresaron que si el Colegio en efecto es una entidad que realiza una gesta de excelencia, no debería temerle a la libertad de asociación, porque aun con afiliación voluntaria tendrá miembros suficientes para continuar con su misión.

Luego de evaluar detenidamente los argumentos de las partes y el derecho aplicable a la controversia, estimo que en este caso, la colegiación compulsoria de los CPA es inconstitucional.

## II

"[C]omo máximos intérpretes de la Constitución, tenemos la indelegable obligación de velar que la Asamblea Legislativa, en el ejercicio de su poder para reglamentar las profesiones, no viole los derechos constitucionales de los profesionales". Rodríguez Casillas *et al.* v. Colegio, 202 DPR 428, 450 (2019).

Es irrefutable que la colegiación compulsoria de una clase profesional es una institución en conflicto con el

derecho de libertad de asociación de sus integrantes. Íd., pág. 448. En la Constitución de Puerto Rico, a diferencia de la Constitución federal, este derecho se recoge de manera expresa. Así, el texto constitucional dispone que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 299. Se trata de un derecho fundamental que está directamente relacionado con la libertad humana y la democracia. Rodríguez Casillas *et al.* v. Colegio, supra, pág. 433.

Nuestra Constitución es moderna y más abarcadora que otras constituciones clásicas, como la de Estados Unidos. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 11. En ella, se evidencia una importante influencia de la Declaración Universal de los Derechos Humanos, proclamada por las Naciones Unidas. Íd. Con relación al derecho a la libertad de asociación, el mencionado documento dispone que "[t]oda persona tiene derecho a la libertad de reunión y de asociación pacíficas" y que "[n]adie podrá ser obligado a pertenecer a una asociación". Art. 20 de la Declaración Universal de Derechos Humanos, Asamblea General de las Naciones Unidas, *Declaración Universal de Derechos Humanos*, https://www.un.org/en/about-us/universal-declaration-of-human-rights (última visita, 28 de abril de 2023).

En armonía con lo anterior, en Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 811-812 (2014), concluimos que "el derecho a la libre asociación necesariamente presupone el derecho de las personas a no asociarse". De igual manera, resolvimos que la intención de los constituyentes al incluir de forma expresa el derecho a la libre asociación en nuestra Carta de Derechos fue reconocer una especie de protección distinta y de mayor amplitud a la que se reconoce al amparo de la Constitución de Estados Unidos. Íd., pág. 811. Por ese motivo, al disponer de estas controversias "resolvemos por fundamentos locales adecuados e independientes al derecho constitucional federal de libertad de asociación". Rodríguez Casillas et al. v. Colegio, supra, pág. 455.

Con ese historial en mente, hemos reiterado que el estándar aplicable a controversias que versen sobre el derecho fundamental a la libre asociación es el escrutinio estricto. Íd. Bajo este escrutinio se presume que la medida impugnada es inconstitucional. San Miguel Lorenzana v. ELA, 134 DPR 405, 425 (1993). Para superar el estándar probatorio, además de articular la existencia de un interés apremiante, el Estado debe demostrar que no tenía a su alcance medidas menos restrictivas que la impugnada para lograr el fin articulado. Rodríguez Casillas et al. v. Colegio, supra, pág. 450.

De forma más clara en Rivera Schatz v. ELA y C. Abo. PR II, supra, págs. 813-814, resolvimos que,

> [C]uando con su proceder el Estado menoscaba un derecho fundamental este **tiene que articular la existencia de un interés apremiante que justifique la necesidad de su actuación**. Además, tal como hemos reconocido con otros derechos fundamentales, **será necesario que el Estado demuestre que no tenía a su alcance medidas menos onerosas que la legislada para lograr el interés articulado**. Solo de esa manera se protege adecuadamente un derecho tan fundamental como el de la libertad de asociación. Además, y conforme al historial que hemos discutido, respetamos la preeminencia que los constituyentes quisieron impartir a este derecho al reconocerlo explícitamente en nuestro documento constitucional. (Negrilla suplida).

III

*A. Junta de Contabilidad:*

En el ejercicio de su poder de razón de Estado, la Asamblea Legislativa aprobó la Ley Núm. 293 de 15 de mayo de 1945, según enmendada, conocida como la Ley de Contabilidad Pública de 1945, 20 LPRA sec. 771 *et seq*. El mencionado estatuto creó la Junta de Contabilidad con el propósito de reglamentar la profesión de la contabilidad pública autorizada. Sec. 2 de la Ley Núm. 293, supra, 20 LPRA sec. 773.

A tales fines, la Asamblea Legislativa le concedió a la Junta la facultad de promulgar reglamentos para la conducción ordenada de sus asuntos y la administración de la ley. Íd. También está facultada para reglamentar lo concerniente a los requisitos de educación continua y solicitar ayuda de otras organizaciones para la implantación de estas reglas. Íd. Asimismo, la Junta de Contabilidad es el organismo con la autoridad de conceder

y renovar las licencias para la práctica de la profesión. Sec. 3 de la Ley Núm. 293, supra, 20 LPRA sec. 779. Consecuentemente, puede revocar o suspender licencias, luego de darle la oportunidad de ser oído al tenedor de la licencia. Sec. 7 de la Ley Núm. 293, supra, 20 LPRA sec. 780. Para ejercer su jurisdicción reguladora, también puede iniciar procedimientos disciplinarios por iniciativa propia o mediante la presentación de una querella. Sec. 9 de la Ley Núm. 293, supra, 20 LPRA sec. 782. Cónsono con lo anterior, la Junta tiene la potestad de emitir citaciones bajo apercibimiento, para compeler la presencia de testigos. Íd. De igual forma, puede acudir a los tribunales para impedir la práctica ilegal de la profesión. Sec. 13 de la Ley Núm. 293, supra, 20 LPRA sec. 786.

Por otro lado, la Sec. 16 de la Ley Núm. 293, supra, 20 LPRA sec. 789, dispone que:

> Todos los estados, récords, planes, documentos de trabajo y memoranda hechos por un contador público autorizado o contador público en relación con, o en el curso de, servicios profesionales prestados a los clientes por tal contador público autorizado o contador público, excepto informes sometidos al cliente por dicho contador público autorizado o contador público serán y quedarán de la propiedad de tal contador público autorizado o contador público, en ausencia de algún convenio expreso en contrario entre el contador público autorizado o contador público y el cliente.

B. *Colegio de Contadores Públicos Autorizados:*

Por su parte, la Ley Núm. 75 de 31 de mayo de 1973, según enmendada, conocida como la Ley para crear el Colegio

de Contadores Públicos Autorizados, 20 LPRA sec. 793 *et seq.*, instituyó al Colegio como una entidad cuasi pública.

Así, se dispuso que la Junta no expedirá o renovará licencias para ejercer la profesión a personas que no sean miembros del Colegio. Art. 3 de la Ley Núm. 75, <u>supra</u>, 20 LPRA sec. 795.

Conforme al estatuto, el Colegio ostenta las facultades siguientes:

> (a) Para subsistir a perpetuidad bajo ese nombre;
> (b) Para demandar y ser demandado, como persona jurídica;
> (c) Para poseer y usar un sello que podrá alterar a su voluntad;
> (d) Para adquirir derechos y bienes, tanto muebles como inmuebles, por donación, legado, tributos entre sus propios miembros, compra o de otro modo; y poseerlos, hipotecarlos, arrendarlos y disponer de los mismos en cualquier forma;
> (e) Para tomar dinero a préstamo y constituir garantías para el pago de los mismos;
> (f) Para adoptar su reglamento, que será obligatorio para todos los miembros, y para enmendarlo en la forma y con los demás requisitos que más adelante se establecen;
> (g) Para velar por el cumplimiento de los cánones de ética profesional que para regir la conducta de los Contadores Públicos Autorizados haya adoptado o en el futuro adopte la Junta de Contabilidad de Puerto Rico;
> (h) Para recibir e investigar las querellas que se formulen respecto a la práctica y/o conducta de los miembros en el ejercicio de la profesión; celebrar vistas en las que se dará oportunidad al miembro afectado o a su representante de someter hojas de trabajo u otra evidencia pertinente; llevar querellas ante la Junta de Contabilidad para la acción correspondiente. Nada de lo dispuesto en este apartado se entenderá en el sentido de limitar o alterar las facultades de la Junta de Contabilidad de Puerto Rico;
> (i) Para proteger a sus miembros en el ejercicio de la profesión y promover su desarrollo

profesional, asimismo para disponer la creación de sistemas de seguros y fondos especiales y otros medios de protección voluntaria;
(j)  Para ejercitar las facultades incidentales que fueren necesarias o convenientes a los fines
(k)  de su creación y funcionamiento que no estuvieren en desacuerdo con esta Ley. Art. 2 de la Ley Núm. 75, supra, 20 LPRA sec. 794.

A su vez, el Colegio está autorizado para fijar una cuota anual que deberán pagar sus miembros. Art. 8 de la Ley Núm. 75, supra, 20 LPRA sec. 800. El incumplimiento con el pago de la cuota por parte de un miembro puede acarrear su suspensión. Art. 9 de la Ley Núm. 75, supra, 20 LPRA sec. 801. No obstante, el Colegio no puede suspender a un colegiado sin obtener autorización previa de la Junta de Contabilidad. Íd.

Por otro lado, la Ley Núm. 75 dispuso que el Colegio deberá expedir un sello acreditativo que los CPA tendrán que adherir a sus informes, opiniones y certificaciones. Art. 10 de la Ley Núm. 75, supra, 20 LPRA sec. 802. Sobre el particular, se dispuso que ninguna agencia de gobierno, tribunal o entidad cuasi pública del Estado podrá aceptar documentos con opiniones, certificaciones o informes que no tengan adherido el sello acreditativo. Íd.

Los contadores públicos autorizados tienen que remitir un índice de bitácora al Colegio, en el que informen las opiniones, informes y certificaciones que han emitido hasta la fecha de radicación. Art. 11 de la Ley Núm. 75, supra, 20 LPRA sec. 803a. De no haber emitido algún informe, opinión o certificación, deberán presentar un informe

negativo. Íd. El índice de bitácora debe incluir: (1) el número de estampilla correspondiente al informe; (2) si el informe se emitió a una persona natural o jurídica, y (3) la fecha y descripción del informe. Íd. El Colegio tiene autoridad para fijar una cuota adicional a los fines de sufragar los costos relacionados a la administración y supervisión de los índices de bitácora. Íd.

Examinadas las facultades que la Asamblea Legislativa le delegó a la Junta de Contabilidad y al Colegio de CPA, procedo a explicar por qué en el caso de autos la colegiación compulsoria no es indispensable para adelantar el interés apremiante del Estado y, por ende, es inconstitucional.

IV

En este caso no existe controversia respecto a que el Estado tiene un interés apremiante en regular la profesión de la contabilidad pública autorizada. Sin embargo, soy del criterio que ni el Colegio ni el Estado demostraron que no tienen a su alcance mecanismos menos restrictivos para adelantar su interés apremiante. Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813.

Sobre ese extremo, me veo precisado a enfatizar que al pautar que la violación de un derecho fundamental tiene que ser el mecanismo menos oneroso, no nos referimos a que sea el mecanismo menos costoso o el que menos esfuerzo requiera. Lo que hemos establecido es que el Estado tiene que utilizar la alternativa que menos lesione derechos fundamentales

para lograr la consecución de su interés apremiante. Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813. Por eso, además de medio menos oneroso, podemos indistintamente denominarlo mecanismo menos intrusivo o restrictivo.

Ahora bien, recordemos que al aplicar el escrutinio estricto la inconstitucionalidad de la interferencia gubernamental se presume. Al ser así, naturalmente también se presume que el Estado podía adelantar sus intereses de otro modo, sin afectar derechos civiles. En ese contexto, me parecen incorrectas las expresiones de algunos integrantes de este Foro respecto a que debemos precisar las características que debe exhibir un medio alterno a la colegiación compulsoria **para que pueda decretarse su inconstitucionalidad.** Particularmente, que solo podemos concluir que existe un medio menos intrusivo si se prueba su viabilidad. Este planteamiento invierte el estándar probatorio y le impone una carga mayor a la persona que pretende vindicar sus derechos. Conforme al escrutinio estricto, una vez se establece la interferencia con un derecho fundamental, no se tiene que probar la inconstitucionalidad de esa intromisión, sino su constitucionalidad.

Aclarado esto, la conclusión de que existe un medio menos intrusivo indiscutiblemente supone su viabilidad. No concluimos que existen medidas menos restrictivas en abstracto, sin un mínimo de plausibilidad. Empero, soy del criterio que el Estado puede tener una alternativa a su

alcance que requiera reajustes e incluso erogación de fondos para su funcionamiento cabal. No por eso deja de ser un mecanismo menos restrictivo **a su alcance**. Pretender lo contrario me parece un contrasentido.

En *Rodríguez Casillas* concluimos que mediante el buen ejercicio de las facultades delegadas a la Junta Examinadora de Mecánicos Automotrices se podían mantener estándares altos en esa profesión. Rodríguez Casillas *et al.* v. Colegio, supra, págs. 452-453. En aquel entonces, esta Curia expresó que en caso de que surgiera la necesidad de elevar los estándares de la profesión no sería necesaria la colegiación compulsoria, **sino modificar los requisitos de admisión** a la profesión, **incrementar la rigurosidad de los exámenes** y la educación continua. Íd. Nótese que identificamos ciertas alternativas, que si bien no estaban en vigor, se encontraban **al alcance** del Estado y descartaban la imprescindibilidad del requisito de afiliación compulsoria.

Lamentablemente, el escrutinio que algunos compañeros recomiendan, *sub silentio,* concluye que si el mecanismo alterno no está en vigor, no puede considerarse una alternativa menos restrictiva, aunque esté disponible. Bajo esa premisa, en la práctica recaería sobre el Estado la determinación de si tiene a su alcance un medio menos intrusivo para evitar lesionar derechos fundamentales. Como consecuencia, serían muchas las garantías constitucionales que se podrían transgredir porque el Gobierno ha dejado

inoperantes otros mecanismos menos restrictivos al no proveer los recursos necesarios para su funcionamiento. De esa forma, el Estado podría ocasionar el problema y aprovecharse de ello para arbitrariamente escoger cuáles derechos constitucionales va a reconocer a la ciudadanía.

Lo que varios miembros de esta Curia al parecer no entienden es que incluso la doctrina federal de escrutinio estricto en otros contextos —que no gobierna esta controversia— le impone un peso tan alto al Estado, que de ser aplicada a este caso, no se llegaría al resultado de declarar la constitucionalidad de la colegiación compulsoria de los CPA. En lo concerniente al análisis del mecanismo menos intrusivo, el Tribunal Supremo de Estados Unidos ha reiterado que se trata de un estándar excepcionalmente exigente. Véanse, Dunn v. Smith, 141 S. Ct. 725 (2021); Holt v. Hobbs 574 US 352, 364 (2015). Por su parte, el tradista Chemerinsky expresa: "[t]his requires that the government prove that it could not attain the goals through any means less restrictive of the right". E. Chemerinsky, Constitutional Law Principles and Policies, 5ta ed. Nueva York, Ed. Walter Kluwer, 2015, pág. 831. Eso no es diferente a lo que hemos resuelto.

Sucesivamente Chemerinsky expone la frase citada en la Opinión de Conformidad de la Jueza Presidenta Oronoz Rodríguez: que cuando se infringe un derecho fundamental, el Estado tiene la carga de probar que ninguna otra alternativa menos intrusiva del derecho **puede funcionar.**

("The government's burden when there is an infringement of a fundamental right is to prove that no other alternative, less intrusive of the right **can work**". (Negrilla suplida). Íd. Dicho de otro modo, el Gobierno no puede presumir, sino demostrar que únicamente la alternativa más lesiva de un derecho puede adelantar sus intereses apremiantes. Dunn v. Smith, supra, pág. 726.

Al evaluar la existencia de alternativas menos restrictivas, el Tribunal Supremo de Estados Unidos no necesariamente se ha limitado a las que discuten las partes. Íd. Una alternativa al alcance del Estado puede requerir incluso legislar o enmendar una ley. Colorado Republican Federal Campaign. Comittee v. Federal Election Com'm, 518 US 606, 609 (1996). "Any reasonable understanding of "available" includes being legally and constitutionally viable". N. Marks, *Least Restrictive Means: Burwell v. Hobby Lobby*, 9 Harv. L. & Pol'y Rev. S15, S18 (2014).

A su vez, al aplicar el escrutinio estricto en una controversia al amparo de la *Religious Land Use and Institutionalized Persons Act of 2000*, 42 USC sec. 2000cc, el Máximo Foro federal rechazó que la parte demandante tuviera que proveer las alternativas menos restrictivas, porque esto invierte el peso de la prueba. Ramirez v. Collier, 142 S.Ct. 1264 (2022). De igual modo, catalogar una alternativa como menos eficiente o conveniente no justifica que se coarten derechos fundamentales. Schneider v. State of New York, 308 US 147, 165 (1939).(En el contexto

de la Primera Enmienda de la Constitución federal se ha expresado: "If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart that information the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press"). Íd.

Contrario a la contención de algunos compañeros, el Estado no satisface el estándar probatorio meramente al establecer que un mecanismo menos restrictivo no funciona actualmente. Mucho menos lo satisface cuando su autoridad para alcanzar los intereses estatales se reconoce por mandato de ley. Es por esa razón que en la controversia que nos atañe, aun si estipuláramos que actualmente la Junta de Contabilidad se encuentra inoperante, eso no atiende el elemento probatorio del escrutinio estricto. Es decir, no demuestra que es imposible tomar medidas para implementar ese o cualquier otro mecanismo menos restrictivo que obligar a los CPA a ser miembros del Colegio.

En la controversia que nos atañe, el requisito de colegiación compulsoria impuesto a los CPA es prescindible. De hecho, el esquema regulador actual, **sin el factor compulsorio**, es una alternativa menos lesiva para regular la profesión. Recordemos que aquí no se encuentra en pugna la existencia del Colegio ni sus deberes y facultades estatutarias. Por lo tanto, el resultado de una

determinación de inconstitucionalidad sería el surgimiento de una colegiación voluntaria y no la eliminación del Colegio.

Indubitablemente, el ente regulador de la profesión de la contabilidad pública es la Junta de Contabilidad y no el Colegio. La Junta es quien único puede expedir, renovar, suspender o cancelar las licencias a los CPA. Secs. 6 y 7 de la Ley Núm. 293, supra, 20 LPRA secs. 779-780. Consustancial con esa autoridad, también puede iniciar procedimientos disciplinarios *motu proprio* o mediante la presentación de una querella. Sec. 9. de la Ley Núm. 293, supra, 20 LPRA 782. Respecto a esos procesos, paralelamente al Colegio se le concedió la facultad de recibir quejas e investigar la conducta de sus miembros. Art. 2 de la Ley Núm. 75, supra, 20 LPRA sec. 794. No obstante, esto es sin perjuicio de los poderes disciplinarios de la Junta de Contabilidad sobre todos los profesionales admitidos al ejercicio de la mencionada profesión. Íd.

Nótese, además, que la Ley de Contabilidad Pública autoriza a la Junta de Contabilidad a solicitar apoyo de otras organizaciones para la implantación de su política reguladora. Sec. 3 de la Ley Núm. 293, supra, 20 LPRA sec. 779. Sobre ese extremo, el Colegio reconoció que "nadie debería poner en duda de que la Junta tiene la capacidad de contratar con terceros para ayudarla a llevar a cabo las obligaciones que la ley le impone. Y así, lo ha venido haciendo por muchos años". Apelación, págs. 16-17. Por

ejemplo, la Junta le delegó a la NASBA la facultad para administrar el examen de reválida y encargarse del proceso administrativo de licenciamiento y renovaciones de licencias a los CPA en Puerto Rico. Los CPA no están obligados a pertenecer a la NASBA para que esa entidad pueda ofrecerles esos servicios. ¿Acaso eso no es menos restrictivo que un requisito de afiliación compulsoria?

No debe quedar duda de que el funcionamiento cabal de la Junta de Contabilidad es un mecanismo menos restrictivo para lograr el cometido del Estado. La crisis económica, sin más, no puede ser justificación para que el Gobierno evada su responsabilidad de realizar esfuerzos para implementar métodos alternos a su alcance, sin tener que interferir con el derecho de asociación de los CPA. No dudo que es más fácil obligar a los CPA a pertenecer al Colegio y que, mediante el pago de la cuota, sea el ente cuasipúblico quien se encargue de adelantar los intereses gubernamentales, pero aquí esa no es la única alternativa y mucho menos es imprescindible. El Estado no está para acomodar al Colegio; su deber es proteger los derechos civiles, incluyendo el derecho a la libre asociación de todos los CPA.

Por otra parte, reconozco que el Colegio realiza unas facultades particulares en cuanto a la venta de estampillas y la supervisión de los índices de bitácora (revisión de calidad). Esas facultades, sin embargo, no están condicionadas al requisito de membresía obligatoria. No se

necesita la colegiación compulsoria para que el Colegio continúe vendiendo las estampillas que los CPA deben adherir a ciertos documentos de trabajo. De igual modo, no se necesita la afiliación compulsoria para que el Colegio sea quien se encargue del proceso de revisión de bitácora. Tan es así que por ley se le otorgó la facultad de cobrar una cuota adicional a la cuota de membresía, específicamente para estos fines. Art. 11 de la Ley Núm. 75, supra, 20 LPRA sec. 803a.

En palabras del propio Colegio "el mecanismo mediante el cual se asegura el requisito de revisión de calidad tanto en Puerto Rico como en las demás jurisdicciones americanas es el mismo: el pago obligatorio de una cuota a una entidad privada que tiene la encomienda de llevar a cabo tal proceso". Apelación, pág. 15. Independientemente de su composición, si el Colegio es el organismo designado para realizar los procedimientos de revisión de bitácora, lo podrá seguir haciendo y cobrando una cuota específica para tal propósito. Ante ese escenario, nuevamente me pregunto ¿acaso eso no es menos restrictivo que el requisito de afiliación compulsoria?

Por otra parte, el argumento de que el procedimiento de revisión de bitácora no podría realizarse por la Junta de Contabilidad sin incidir sobre el derecho a la intimidad de los clientes de los CPA, es patentemente inmeritorio. Primero, pues como he dicho, la colegiación voluntaria no incide sobre la facultad del Colegio de realizar estos

procedimientos. Segundo, repetidamente hemos resuelto que el derecho a la intimidad opera *ex proprio vigore* y puede hacerse valer entre personas privadas. Arroyo v. Rattan Specialties, Inc. 117 DPR 35, 64 (1986); Colón v. Romero Barceló, 112 DPR 573, 576 (1982); Alberio Quiñones v. ELA, 90 DPR 812 (1964); González v. Ramírez Cuerda, 88 DPR 125 (1963). Si el proceso de revisión de calidad supusiera una violación al derecho a la intimidad de los clientes de los CPA, el Colegio como entidad cuasipública no estaría exento de vulnerarlo.

Como bien señaló el Colegio, en las demás jurisdicciones estadounidenses el proceso de revisión de calidad es realizado por grupos privados. Asimismo, no se requiere a los CPA ser miembros de una asociación para regular esta profesión en Estados Unidos. Entonces, la pregunta forzada es ¿por qué en Puerto Rico se necesita obligar a los CPA a ser miembros de una asociación? Ineludiblemente, no existe una razón válida más allá de la conveniencia del *status quo*.

En contraposición, la escueta respuesta que nos brindan algunos miembros de este Tribunal es que "distinto a otras jurisdicciones de Estados Unidos, nuestra Junta de Contabilidad -según evidenciado en este caso- no funciona". Op. de conformidad, Jueza Presidenta Oronoz Rodríguez, pág. 33. La expresión reconoce que existen otros modelos para regular esa profesión, sin colegiación compulsoria. De igual modo, concluye —sin mayor fundamento— que en otras

jurisdicciones esos modelos funcionan, pero en Puerto Rico no. Ahora bien, me parece incorrecto llegar a esa conclusión sin que sea la parte que sostiene la validez del requisito de colegiación quien justifique las razones de esa dicotomía. Eso es así, máxime, cuando las jurisdicciones en las que no existe colegiación compulsoria participan del mismo mecanismo de reciprocidad de licencias y validez extrajurisdiccional del trabajo de los CPA que tiene Puerto Rico.

Lo antes expresado no es incompatible con nuestro precedente ni ajeno a la doctrina de escrutinio estricto. Por el contrario, es el Estado quien tiene la carga de demostrar que lo que se hace en otro Estado para proteger un derecho fundamental no funcionaría en su jurisdicción. Evidentemente esa carga procesal es pesada para el Gobierno y usualmente será imposible apoyarla, porque la experiencia práctica en otras jurisdicciones nos dice que es posible hacer las cosas sin interferir con el derecho fundamental. Por ejemplo, en un caso reciente del Tribunal Supremo de Estados Unidos sobre libertad de religión, el Máximo Foro Federal expresó que el Estado de Texas no justificó por qué en otras jurisdicciones se realizaban acomodos para permitir que un pastor estuviera presente y orara durante la ejecución de una persona condenada a pena de muerte, pero Texas no podía hacerlo. Véase, Ramirez v. Collier, supra, pág. 1268.

En el caso que nos ocupa, el Colegio abordó el esquema regulatorio de otras jurisdicciones, pero no para explicar por qué en Puerto Rico la colegiación compulsoria era indispensable, sino para justificar el pago obligatorio de una cuota a entidades privadas. A esos fines, sobre el proceso de revisión de bitácora en algunos estados de Estados Unidos, expresó que: "[n]o se le llama colegiación obligatoria, pero en todas y cada una de esas jurisdicciones se les requiere a los CPA que le paguen una cuota anual a la entidad análoga al [Colegio]" para cumplir con la obligación del proceso de revisión de calidad. Apéndice TS, pág. 280.

Ciertamente, esa expresión me parece otra manera de decir la frase coloquial "el nombre no hace la cosa". A juicio del Colegio "el pago de una cuota compulsoria —que es lo único que la colegiación compulsoria requiere de los contadores públicos autorizados— es meramente un costo adicional impuesto por el Gobierno para reglamentar la profesión." Apelación, pág. 18. Por eso, no dudó en catalogar la colegiación compulsoria como una lesión mínima, e incluso, como una "leve incomodidad". Íd., pág. 16.

El argumento del Colegio es tan inmeritorio como desafortunado. ¿Cómo podemos pensar que la colegiación compulsoria es una "lesión mínima" al derecho de asociación de los CPA, cuando la práctica de esa profesión sin ser miembro del Colegio supone la comisión de un delito? Para

ser precisos, si un CPA no está afiliado al Colegio y continúa practicando la profesión incurrirá en un delito menos grave que podría acarrear multas y pena de reclusión por no más de un año. Sec. 14 de la Ley Núm. 293, supra, 20 LPRA sec. 787. Lastimosamente, eso es lo que esta Curia validó con su determinación; que el ejercicio del derecho de libertad de asociación de los CPA sea penado con cárcel.

Finalmente, y sin caer en la repetición de un estribillo, me parece evidente que estas controversias se resuelven caso a caso. En nuestros precedentes sobre el tema, no declaramos la inconstitucionalidad de todos los estatutos que imponen requisitos de colegiación compulsoria. Nunca declaramos la inconstitucionalidad de una ley por analogía. Lo que sí establecimos fue que las medidas de colegiación compulsoria deben superar un escrutinio estricto, dado que están en conflicto con el derecho a la libertad de asociación de sus miembros. Naturalmente los derechos no son absolutos. Si así fuera, no sería necesaria la aplicación de un escrutinio.

No obstante, —en aras de evitar un supuesto automatismo en la resolución de estas controversias— varios miembros de este Máximo Foro pretenden que adoptemos un escrutinio tan laxo que dejaría al arbitrio del Estado la decisión de si tiene o no alternativas para evitar transgredir derechos fundamentales. La mejor muestra de esto es precisamente el resultado al que llegan algunos compañeros en este caso. Entiéndase, que opinan que el Estado y el Colegio de CPA

superaron el estándar probatorio con meramente presentar cuatro declaraciones juradas —esencialmente repetitivas— sobre la supuesta incapacidad presupuestaria y falta de personal de la Junta. Así de fácil se lograría justificar la vulneración del derecho de los profesionales a asociarse con quien deseen y no con quien el Estado ordene. ¿Cómo podemos llamarle escrutinio estricto a eso?

En el pasado advertí y hoy confirmo que este Tribunal se dirige a reinsertar la página negra de la colegiación obligada de los profesionales para practicar su profesión. Reyes Sorto y otros v. Estado Libre Asociado de Puerto Rico y otros, 2023 TSPR 62, 211 DPR_ (2023) (Op. Disidente, Juez Asociado Martínez Torres). Jamás pensé ver un retroceso de tal magnitud en el desarrollo de nuestra doctrina constitucional.

La mesa está servida para que con cambios menores a la legislación existente, el Estado se trague los derechos de libre asociación de otros profesionales a quienes alguna vez se los protegimos, como los mecánicos automotrices y los abogados.

Por los fundamentos antes expuestos, disiento respetuosamente. Habría confirmado la determinación de inconstitucionalidad de la colegiación compulsoria de la profesión de la contabilidad pública autorizada.

RAFAEL L. MARTINEZ TORRES
Juez Asociado